Argued September 12, 1978, modified and
remanded March 27, 1979

# BEND MILLWORK COMPANY, *Respondent,*

*v.*

# DEPARTMENT OF REVENUE, *Appellant.*
## (TC 1052, SC 25462)

592 P2d 986

[578]

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs was James A. Redden, Attorney General, Salem.

Alan H. Johansen, of Whipple, Johansen & McClain, Portland, argued the cause and filed a brief for respondent. With him on the brief was Stewart M. Whipple, of Whipple, Johansen & McLain, Portland.

Before Denecke, Chief Justice, and Holman, Howell and Lent, Justices.

LENT, J.

**LENT, J.**

This case is concerned with fixing the true cash value of plaintiff's industrial property as of January 1, 1974, and January 1, 1975. The principal dispute centers on the effect upon value of claimed plant "layout" deficiencies. Defendant appeals from the decree of the Oregon Tax Court reversing an order of the Oregon Department of Revenue.[1] We modify but substantially affirm.

The subject property is a production millwork plant, including buildings, machinery and equipment, located near Bend in Deschutes County. The 23-acre plant site in the Bend Industrial Park is served by a mainline right-of-way of the Burlington and Northern Railroad, as well as by a fully improved road connection to U. S. Highway 97. The plant began operation in 1965 as a custom millwork shop known as Lee Millwork Company. It was acquired in 1969 for $589,278 by the plaintiff, a creditor, when the former company became insolvent. The plant, consisting then of one large building with machinery and equipment, was basically a specialty millwork plant manufacturing bow windows, but some time after the 1969 acquisition the plaintiff changed to manufacturing mouldings and millwork. Since 1969 other buildings and machinery have been added to the plant, the additional improvements amounting to approximately $1,827,300 through 1973. An additional $803,800 was invested in 1974. The number of workers that year was approximately the same as the year before, amounting to about 220 production and maintenance employes working on a two-shift, five-day basis.

The parties' respective valuations of the property for the two dates are as follows:

---

[1] The tax court entered its decree on August 25, 1977, reversing defendant's Opinion and Order No. VL 76-179. The judge of the tax court made a written decision, but it was not printed in the Advance Sheets of Selected Cases. The case is Oregon Tax Court No. 1052.

|                          | January 1, 1974 |              |
|                          | Plaintiff       | Defendant    |
| ------------------------ | --------------- | ------------ |
| Buildings and Structures | $ 900,500       | $ 901,100    |
| Machinery and Equipment  | 1,333,050       | 1,239,000    |
|                          | 2,233,550       | $2,140,100   |
| Functional Obsolescence  | - 986,370       |              |
|                          | $1,247,180      |              |

|                          | January 1, 1975 |              |
|                          | Plaintiff       | Defendant    |
| ------------------------ | --------------- | ------------ |
| Buildings and Structures | $1,194,140      | $1,194,140   |
| Machinery and Equipment  | 1,729,760       | 1,869,770    |
|                          | 2,923,900       | $3,063,910   |
| Functional Obsolescence  | - 986,370       |              |
|                          | $1,937,530      |              |

In defendant's post-trial memorandum to the tax court an arithmetical correction was made, reducing the $3,063,910 figure to $3,050,620. The values for the buildings and structures are the same because plaintiff accepted defendant's values except for a $600 change for 1974 which defendant made between the department hearing and the tax court proceeding. The tax court adopted the plaintiff's valuations, except for the "functional obsolescence" value which the tax court found to be $805,200. Plaintiff had originally asserted that value, and the tax court made no mention of plaintiff's amended value. The values found by the tax court, then, were $1,428,350 for January 1, 1974, and $2,118,700 for January 1, 1975.

■ In an appeal from the tax court this court performs two separate appellate functions. This court sits as an "error correcting" court, in which it performs the ordinary appellate function of deciding whether the trial court committed an error of law and, if so, whether the error requires reversal. In addition to that function this court is charged with a fact finding function, for upon "appeal and review" of tax court decisions, we try the case "anew upon the record." ORS 305.445 and 19.125(3). In considering assignments of error neither the parties nor this court have always kept the two functions as separate as may be desirable.

[580]

This sometimes leads to citation of an opinion of this court for what the party conceives to be a rule of law, but which is really only a finding of fact upon the evidence in the record in the cited case. In this opinion we shall try to avoid confusion of the two functions.

The legislature requires that plaintiff's property be assessed at true cash value, which "means market value as of the assessment date." ORS 308.205.[2] The defendant does not contend that the tax court refused to apply the statute or misinterpreted it. Rather the defendant asserts that the tax court failed to fix true cash value as required by the statute because the tax court allegedly failed to follow the opinion of this court in *Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 530 P2d 88 (1974).

That case, as is this, was largely concerned with the effect on true cash value of "design" or "layout" deficiencies of the plant. In that case both parties agreed that it was not possible to utilize either the market data or capitalization of income approach to valuation and, therefore, agreed that the cost-summation approach had to be used. In that case both parties acknowledged that faulty layout problems caused operating costs which would not exist in the absence of that defect. Both parties agreed that this "would cause a prospective purchaser to discount the value of the plant *in comparison to a plant of similar cost* without such deficiencies." (emphasis added) 270 Or at 740. It followed that both parties agreed that the layout "deficiencies would be taken into account in the market to reduce the value of the property *below the sum of the costs of its parts.*"(emphasis added) 270 Or at 742. In that case we noted that both parties agreed that the cost-summation approach yielded a certain value which was termed the "ordered value."

---

[2] ORS 308.205 provides in part: "True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue." Neither party has cited to us any rule or regulation so promulgated; therefore, we assume that there is no dispute in this case which is resolvable by resort to a rule or regulation.

In *Publishers* the parties disagreed as to whether the ordered value was to be discounted for the layout deficiencies. We said that the "defendant maintains that the ordered value * * * already reflects a discount of approximately 5% of the depreciated reproduction cost of the plant and that this allowance was sufficient." 270 Or at 741. We found that the assessor had approached the problem by incorporating a factor for the deficiency in layout into the depreciation of each of the items, which were then summed up to yield the overall value of improvements and machinery. On the other hand, this court found that plaintiff had followed a different method for determining the effect of layout deficiency upon value.

"* * * This method, based on the definition of *functional obsolescence* as the reduction in value due to excess operating costs produced by faulty layout, requires comparison of the operating costs of the subject property with the operating cost of a functionally similar plant lacking the deficiencies. The excess operating cost of the subject property is then capitalized and deducted from the value of the plant arrived at without reference to the deficiencies. There is complete agreement *in this case* that this method is the best available under current theory." (emphasis added) 270 Or at 743.

We now pause to consider some problems of terminology. Until setting forth the above quotation we had purposely avoided, as much as we could, the terms "functional obsolescence" and "special functional obsolescence." We did so because the terms were used rather indiscriminately in our opinion in *Publishers,* while the defendant here has adduced evidence and argued for a difference in meaning between the two terms. Plaintiff, for its part, adduced evidence which did not recognize such a difference; nevertheless, plaintiff in its brief to this court has attempted to use the term "special functional obsolescence" in the same sense as did the appraiser called as defendant's witness. We confess to some trouble in understanding certain of the arguments made in defendant's briefs in

this court because it does not seem to us that defendant's counsel consistently used the term "special functional obsolesence" in the same sense as did its witness.

■ In our role as fact finder in this trial "anew upon the record" it is essential that we understand the meanings of various terms appearing in the evidence. This task becomes almost overwhelmingly difficult when persons involved as professional appraisers or as legal counsel in the trial use a given term differently than do others so involved or refuse to recognize the validity of a term used by another professional. When such differences occur the judge, as fact finder, must be careful to determine the meaning of the term in a way which is not violative of the rules of law governing the fact finding process in general. The temptation is to seek outside help, and in many instances this may be done properly. For instance, a problem of the meaning of words may be solved by application of ORS 41.410(1).

> "There are certain facts of such general notoriety that they are assumed to be already known to the court and evidence of them need not be produced. The following facts are assumed to be thus known but the court may resort for its aid to appropriate books or documents of reference:
>
> "(1) The true signification of all English words and phrases, * * * "

The statute certainly permits resort to ordinary dictionaries compiled by universally recognized lexicographers to ascertain the "true signification" of words and phrases even though they are not used in ordinary intercourse and are outside the active and passive vocabularies of even the well educated. The statute probably permits resort to special dictionaries or glossaries for ascertainment of the "true signification" of words and phrases used in those fields of thought and endeavor which we describe as being "scientific," especially in the mathematical sciences.

[583]

As we leave those fields, however, self-restraint must be exercised in order to avoid the taking of evidence from a source not subject to confrontation and cross-examination. We would not allow a jury during deliberation to send out for the opinion of an outside expert as to the true meaning of a term upon which the experts called as witnesses in open court had disagreed. It follows that we should not allow ourselves to do so when discharging our fact finding function. This is not to say that, given the different circumstances in which judges and juries discharge that function, judges cannot resort to outside reading in order better to understand the evidence, but the judge must be ever conscious that the material read is not to be considered as evidence itself unless the material is a proper subject of judicial notice. Even then the judge must be careful to recognize that he is actually receiving evidence by way of judicial notice and follow the governing procedural rules of law.[2a]

In the case at bar we find there to be inconsistent use both in the evidence and in argument of the terms "functional obsolescence" and "special functional obsolescence." As a matter of curiosity only we have

_____

[2a] These remarks are not applicable when considering "legislative" facts as distinguished from "adjudicative" facts.

"* * * Legislative facts are those used by courts in arriving at policy decisions, such as formulating a proper rule of law to be applied to a particular case; adjudicative facts are those about the particular parties to the controversy and their specific interests and transactions. Thayer long ago stated that judicial notice belongs to the general topic of legal or judicial reasoning, and is not confined to the topic of evidence. In making such statement, it seems likely that Thayer had in mind the court's use of social and economic data obtained by judicial notice when acting in a policy making capacity.

"* * * * *

"However, fairness to the parties would seem to require than an appellate court give notice of any contemplated taking of judicial notice of adjudicative, as distinguished from legislative, facts if the court deems there is any reasonable probability that the same may turn out to be disputable. * * *" (footnotes omitted) Currie, "Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation," 1960 Wisconsin LR 39, 50, 51.

[584]

consulted a relatively recent publication[3] to see if those terms are given even other meanings by other qualified practitioners. In so doing we find a definition of "functional obsolescence" which is arguably different from that used in the evidence. There is no definition whatsoever of "special functional obsolescence." This is ample illustration of the point that we should not go outside the record for help in understanding such terms.

We now return to further consideration of *Publishers.* There we used both "functional obsolescence" and "special functional obsolescence" in speaking of the same kind of valuation problem as we have in this case. It is readily ascertainable from only a cursory examination of that case that the terms were used interchangeably. In that case resort was had to some sort of dictionary or glossary of terms for a definition of "functional obsolescense."[4] We stated, 270 Or at 737,

> "Functional obsolescence in the world of appraising is a species of depreciation and may be defined as a '* * * lack of desirability in layout, style, and design and (sic) [as] compared with that of a new property serving the same function.' "

That definition gave to the term a meaning which defendant in this case urges should properly be termed "special functional obsolescence."

■ With respect to *Publishers* all of this discussion is important only because defendant contends that in *Publishers* we found that consideration of this form of obsolescence resulting from layout deficiencies was

---

[3] *Real Estate Appraisal Terminology,* compiled and edited by Byrl N. Boyce, Ph.D., Center for Real Estate and Urban Economic Studies, University of Connecticut, sponsored jointly by the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers. Published in 1975 by Ballinger Publishing Company.

[4] It does not appear from the opinion whether the source had been received in evidence or whether the definition from that source had come in by way of testimony from a competent witness. If either occurred, this court was justified in using the definition; if not, we went outside the record for evidence and should not have done so.

only appropriate if excess operating costs are determined by comparison of labor and equipment needs of the present plant with those of an optimum plant, then capitalizing the "negative income" thereby ascertained, and then deducting that amount from the value of the optimum plant. Defendant asserts this is the *"legal* principle of *Publishers."* (defendant's emphasis). It is in this point that defendant misconstrues what we did in *Publishers.* Adoption of that method was not the statement of a "legal principle" or a rule of law. As a "holding" it was merely a finding of fact on the record before the court that the method should be applied in that case and a disposition of the factual controversy by application of that appraisal method.

That it was not a rule of law which was established in *Publishers* to apply to all cases involving this kind of obsolescence is clear from the plain language we there used. First of all, attention is directed to the quotation from *Publishers,* 270 Or at 743 above set forth. The last sentence from that quotation is:

"There is complete agreement in this case that this method is the best available under current theory."

Plaintiff and defendant there *agreed* the method was the best one to use. Next, we ended that opinion in such manner as to make it clear that we had acted in our role as fact finder.

"* * * We hold that the foregoing amount is the fair market value of the subject property * * * as shown by the evidence in this case.

"This holding does not constitute the rule that the methods used to determine functional obsolescence in this case are necessary or appropriate in all cases *as a matter of law.* It may be that other and better methods are available or will be developed in the future. It might even be that a different record will show the method approved to day [sic] is subject to significant inadequacies. Nor should this opinion be taken to stand for the principle that a rough estimate of obsolescence registered in an assessment item-by-item can never be sustained. We hold, merely, that *on the record before us* the plaintiff is entitled to an

[586]

adjustment in the amount stated above." (emphasis added; footnote omitted) 270 Or at 756-57.[5]

■ We are now ready to proceed with our statutory responsibility to try the case "anew upon the record." At this point we take note of the circumstance that the statutory framework for these cases may not be clear as to which party has the burden of proof. ORS 305.445 provides that appeals from the tax court to this court and the review by this court of final decisions and final orders of the tax court "shall be in accordance with the procedure in equity cases on appeal from a circuit court[.]" We have said that this statute directs us to sit as a court of equity on appeals and, therefore, to try the case anew upon the record (sometimes "review the record de novo") because of ORS 19.125(3). *See,* for example, *Publishers Paper Co. v. Dept of Rev., supra.* However, ORS 305.427 provides:

> "In all proceedings before the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party *seeking affirmative relief* and the burden of going forward with the evidence shall shift as in other civil litigation." (emphasis added)

This sparks the question as to whether defendant has the burden of proof *in this court* when defendant is the appellant.

ORS 305.427 was passed in 1965 and our research indicates it has been cited in eight cases until now.[6] In six of those cases the taxpayer was the appellant from

---

[5] Although *our discussion here has assumed* that defendant has correctly characterized what we did in *Publishers* as deducting the capitalized figure from "replacement cost new" of the optimum or model plant, we do not necessarily agree that that is what we actually did.

[6] *Jeddoloh v. Department of Revenue,* 282 Or 291, 578 P2d 1233 (1978); *Lethin v. Dept. of Revenue,* 278 Or 201, 563 P2d 687 (1977); *Equit. Sav. & Loan v. Dept. of Rev.,* 272 Or 457, 537 P2d 538 (1975); *Publishers Paper Co. v. Dept. of Rev.,* 270 Or 737, 530 P2d 88 (1974); *J. R. Widmer, Inc. v. Dept. of Rev.,* 261 Or 371, 494 P2d 854 (1972); *Reynolds Metals v. Dept. of Rev.,* 258 Or 116, 477 P2d 888, 481 P2d 352 (1971); *Swan Lake Mldg. Co. v. Dept. of Rev.,* 257 Or 622, 478 P2d 393, 480 P2d 713 (1970); *Bush v. Tax Commission,* 244 Or 261, 416 P2d 1021 (1966).

the tax court to this court. The statutes in those cases created no question as to which party had the burden of proof; obviously it was the taxpayer. In one of the other two cases the taxpayer was a cross-appellant, and with respect to the cross-appeal we noted that the taxpayer had the burden of proof. Again, this would seem to be the clear intent of the statute. The case was silent as to which party had the burden of proof on the appeal by the Department of Revenue. In the remaining case both parties appealed, and again the taxpayer was the respondent/cross-appellant. Without any discussion whatsoever of the text of the statute, but in an opinion in which it was unnecessary to separate discussion of the appeal from the cross-appeal, we simply stated that the taxpayer had the burden of proof. None of those cases involved the situation here where the defendant in the tax court is the only appellant in this court. Neither party has raised the question as to which has the burden of proof under these statutes, and we decline to actually decide whether it is the defendant Department of Revenue in the absence of adversarial briefing. We shall, therefore, assume without deciding that on this appeal the taxpayer has the burden of proof.[7]

We turn now to a consideration of the evidence in order to arrive at the true cash value of the property on the relevant assessment dates.[8] Experience teaches us that in these valuation cases there are three traditional approaches or methods. They are the market (com-

---

[7] In *J. R. Widmer, Inc., v. Dept. of Rev., supra,* 261 Or at 376, in a different context we said, "The traditional rules of the civil litigation, as in equity, apply." Whether or not a successful plaintiff in an ordinary suit in equity has the burden of proof on appeal by the defendant is not necessarily dispositive of the question raised by the defendant's appeal in the case at bar, for the statute, ORS 305.427, has no application to an ordinary appeal in equity.

[8] This writer has often wondered why this court in this kind of case spends so much time in sifting *in writing* the evidence. We are not required to make special findings of fact, and the detailed discussion of the evidence cannot be of any great help to the bench or bar in resolution of issues of fact in other cases involving different evidence. I suppose we do it to show that indeed we have carefully considered the evidence. In other words the process demonstrates appellate accountability.

parable sales) approach, the income (capitalized income) approach and cost-summation approach. Neither party here contends that the income approach should be used or sought to use that approach, and that is about the only thing upon which they agree.

■ ■ The disagreement centers upon two elements of the assessment process: the basic appraisal valuation and the deduction, if any, for functional or special functional obsolescence. From the evidence in the record we find that "functional obsolescence" is properly applied to the out-of-date aspect of machinery and equipment and building materials; that is, it is inherent in the physical property itself and should be reflected in the concept of depreciation. We find that "special functional obsolescence" is properly applied to the aspect of excess operating costs resulting solely from economically incurable design or layout deficiencies. We find as a basic fact that this plant has such deficiencies and that it is economically incurable because a cure would require substantially the complete demolishment of structures and rearrangement of machinery and equipment to overcome the "material flow" deficiency resulting from the present physical characteristics of the structures and placement of the machinery and equipment.

That we have evolved definitions of these two troublesome terms for the purpose of our own discussion does not alter the fact that in discussing the evidence we are faced with the circumstance that plaintiff's appraiser, Mr. Stewart, used "functional obsolescence" to mean what we find to be "special functional obsolescence," and, for the most part, defendant's appraiser, Mr. Ensign, used the terms to mean substantially the same as our definitions. Mr. Ensign, however, consistently contended that the term "special functional obsolescence" has meaning only with respect to the replacement cost technique of appraisal under the cost-summation method and is not

applicable to the reproduction cost technique. As will be seen we do not accept that opinion of Mr. Ensign.[9]

On the basic valuation the parties utilized significantly different approaches. Plaintiff did a unit-by-unit valuation of the machinery and equipment for both years, using two methods; the reproduction cost new less depreciation or market data on similar used machinery and equipment. Defendant for January 1, 1974, correlated a market approach with a cost approach, in turn based on a correlation of reproduction and replacement cost valuations. Defendant's January 1, 1975, valuation was determined by applying "trending factors" to its January 1, 1974, valuation.

While plaintiff's appraisal process and figures are adequately described above, it is helpful to lay out in detail defendant's appraisal process and figures:

COST APPROACH

Reproduction Cost Technique No. 1:

|  | RCN (repro. cost new) | DRC (deprec. repro. cost) |
|---|---|---|
| Buildings and Structures ...... | $1,209,200 | $ 901,100 |
| Machinery and Equipment.... | 1,782,000 | 1,188,000 |
|  |  | $2,082,100 |

(The addition actually results in a figure of $2,089,100, but since defendant used the above total in the following computations, we will also use it for the purposes of this chart.)

Replacement Cost Technique No. 2:

|  | RCN (repl. cost new) | DRC (deprec. repl. cost) |
|---|---|---|
| Buildings and Structures ...... | $1,209,200 | $ 901,100 |
| Machinery and Equipment.... | 2,387,300 | 1,253,000* |
|  |  | $2,154,100 |

---

[9] Reproduction cost and replacement cost are two methods used in approximating the value of the existing plant. Mr. Ensign defined "reproduction cost" as "a replica of the unit of property under appraisement." He defined "replacement cost" as "an equally good substitute and is the modern day equivalent of the subject property." Plaintiff does not quarrel with those definitions, only with the applicability of replacement cost to valuation in this case. We shall use Mr. Ensign's definitions.

(*The DRC value was actually $1,690,510, which minus a machinery and equipment "special functional obsolescence" value of $437,385, resulted in a rounded value for machinery and equipment of $1,253,000.)

Correlation of Cost Values:

| | | Weight | |
|---|---|---|---|
| Cost Technique No. 1 | $2,082,100 | .70 | $1,457,470 |
| Cost Technique No. 2 | 2,154,100 | .30 | 646,230 |
| | | | $2,103,700 |

(In its appraisal report defendant stated, "The weight of .70 for the Reproduction Cost New Technique was selected because the Machinery & Equipment is comparable in design function and performance to that available on the current market.")

MARKET APPROACH

| | 1969 Purchase Price | Jan. 1, 1974 Adjusted Value |
|---|---|---|
| Buildings and Structures | $ 309,116 | $ 942,000 |
| Machinery and Equipment | 280,162 | 1,239,000 |
| | $ 589,278 | $2,181,000 |

CORRELATION OF COST AND MARKET VALUES: January 1, 1974

| | | Weight | |
|---|---|---|---|
| Cost | $2,103,700 | .50 | $1,051,850 |
| Market | 2,181,000 | .50 | 1,090,900** |
| | | (rounded) | $2,140,000 |

(**The figure $1,090,900 should be $1,090,500)

■ We turn our attention first to the matter of using the market approach. Although Mr. Ensign testified that there had been other moulding plant sales for study, he found none of them to be comparable. He found the only comparable sale to be that of the subject property from Lee Millwork to plaintiff in 1969. The evidence discloses he utilized that sale as follows to arrive at the figure he used above in correlation:

"Purchase price of the Real Property Improvements as recorded by Bend Millwork on their depreciation schedule was $589,278, allocated as follows:

| | |
|---|---|
| Buildings and Structures | $ 309,116 |
| Machinery and Equipment | 280,162 |
| | $ 589,278 |

[591]

"This sale has been adjusted for time and various changes to indicate an estimate of market value as of January 1, 1974 of $2,181,000, allocated as follows:

Buildings and Structures............................$ 942,000
Machinery and Equipment..........................  1,239,000
                                                   $2,181,000"

Plaintiff agreed that there were no other sales which were comparable, but disagreed that the 1969 sale of the subject property was comparable. In this respect we find plaintiff to be correct. The 1969 sale was less than an arms-length transaction. It was a distress sale from an insolvent debtor to a creditor; it was somewhat too remote in time for us to feel justified in giving it substantial consideration; and the necessity of very substantial adjustment for alteration of the plant by the taxpayer-purchaser all combine to cause us to reject the market approach as having utility for valuation in this case.

We now come to the matter of special functional obsolescence as presented and considered by Mr. Ensign in valuation under cost approach technique No. 2, as shown in the table and comments above set forth. He explained this cost approach technique and his arrival at the special functional obsolescence figure of $437,385:

"This technique *does not* address itself to producing a replica; instead, consideration is given to the present day industry standards for constructing a unit of property that is an equally good substitute and is the modern day equivalent of the subject property. We have utilized this technique and have estimated the replacement cost new as of January 1, 1974. The value is determined by estimating and deducting the physical deterioration that is inherent in the subject property in relation to the cost of the modern day equivalent unit of property. Functional obsolescence was eliminated with the selection of modern day equivalent unit of property and the resultant replacement cost new. However, when the subject property suffers from excess operating costs, in relation to the costs of operating the modern day equivalent, an

[592]

allowance to reflect the negative earnings and the resultant loss in value will be labeled special functional obsolescence, and deducted from the depreciated replacement cost.

"* * * * *

"Special Functional Obsolescence

"There is excess operating costs in the subject plant as compared to the modern counterpart. Some *improved methods of sorting and handling at the Rip and Cutlines and at various other machines* are evident in the replacement plant. When compared to the subject plant this could result in a saving of approximately 15 men, or roughly 5% of the present workforce.

"Thus - 15 men [at] $13,000 annually = $195,000. Approximately $97,500 after income tax adjustment as net income to the company. Converting this net income to a negative value assuming a 6-yr life (tied to the reappraisal cycle) and a 9% rate.

"The present worth factor for 9% and 6-yr. life is 4.486.

"4.486 × $97,500 = $437,385 as a further deduction for Functional Obsolesence." (emphasis added)

The quotation is actually taken from Mr. Ensign's appraisal report which was received in evidence; however, he read it into testimony without significant change, and his testimony immediately following the reading shows that when he used the term "Functional Obsolescence" here he actually meant "special functional obsolescence." This is further demonstrated by his testimony on cross-examination:

"A We observe the functional obsolescence and we estimate any functional obsolescence in the pieces of equipment that we look at.

"Q In the — this is functional obsolesence in the equipment itself?

"A Yes.

"Q In other words, if you look at a particular machine and are of the opinion that some more modern machine would be more efficient, you make

an allowance for that? Is that — is that what you're saying?

"A   Yes.

"Q   And was that done in making your appraisal of the subject property as of 1-1-74 as reflected in Exhibit A?

"A   Yes.

"Q   Now, as I understand what you described in Exhibit A, and in your earlier testimony as Technique No. 2, the replacement cost approach was that — was that same functional obsolescence that you were just talking about in the machinery itself was that utilized in the replacement cost approach?

"A   No, because on your replacement cost plant, you are replacing the utility of the subject plant. So you have eliminated the functional obsolescence that you would have used in the reproduction cost.

"Q   You have eliminated the functional obsolescence in the equipment itself?

"A   Yes, by replacing it with its modern counterpart.

"Q   I see. As I understand it, however, under the replacement cost approach, you do recognize in a stated amount something described in Exhibit A as special functional obsolescence which is related to excess operating costs?

"A   Yes.

"Q   Now were you — you were present during the earlier session of this trial last December when some of the plaintiff's witnesses talked about functional obsolescence as related to layout of the plant?

"A   Yes.

"Q   Do you recall that testimony? Is that essentially the same kind of functional obsolescence that you used under your replacement cost approach?

"A   Under replacement cost approach?

"Q   Yes.

"A   You mean the special functional obsolescence—

"Q   Yes.

"A   —that they had mentioned? Yes.

"Q   All right. And is it your opinion that that special functional obsolescence resulting from de-

[594]

ficiencies in layout is not applicable in the reproduction cost approach?

"A   It is not, in my opinion."

Despite the above quoted evidence from its own appraiser, defendant argues in at least four distinct and separate parts of its brief on appeal to this court that Mr. Ensign did not recognize any obsolescence problem with respect to "production flow or layout problem." Defendant asserts that Mr. Ensign recognizes the problem only with respect to the saving of the labor of some 15 men with respect to the cost of "different new equipment." Says defendant in its brief:

> "* * * Thus Mr, [sic] Ensign proceeded on the assumption that different machinery would be installed in the present unchanged building to effect a labor savings of 15 men. The added machinery and equipment cost to effect the labor saving is about $600,000."

We simply believe there is no fair reading of Mr. Ensign's evidence that would support the conclusion that he was relating the negative income factor produced by the labor cost of these 15 men to other than layout problems. At any rate, this court concludes that he was considering projected labor cost savings, or conversely the excess operating costs in the subject plant, with respect to layout deficiencies.[10]

---

[10] Defendant argues in its brief that the plant is modern and typical of the industry, and thus there is no layout problem with the plant. However, a typical plant is not necessarily an ideal plant, and a plant's "modernity" doesn't necessarily reflect an ideal plant layout, such as here where the modern part is built around the old bow window manufacturing building. The special functional obsolescence of the plant layout is the result of an inefficient layout, not an outdated layout.

Defendant also argues in its brief that plaintiff's model plant doesn't reflect plaintiff's recent expansion or its plans for future expansion, and thus the model plant is not valid. Just as the model plant without layout problems is not determined by whether it is modern or typical, but rather by whether it is ideal, so too it need not be reflected in a plant's actual development plans. There are any number of reasons why an existing plant's development plans would not reflect an ideal layout, the primary of which is that it is probably more economical to build upon the existing structure than to build the ideal plant.

Where Mr. Ensign differs from plaintiff's appraiser, Mr. Stewart, is in what way this factor is to be taken into consideration,[11] and we now reach the plaintiff's witness' theory as to the proper way to treat this factor under appraisal theory.

As noted above plaintiff did a unit-by-unit valuation of the equipment and machinery. Plaintiff's accountant testified to the book value of the machinery and equipment. In doing so he used, where available, the invoice price plus the "freight in" cost and the installation cost. Where maintenance provided a replacement part which had more than one year life, the cost of the part was capitalized. Plaintiff called two new and used machinery salesmen to evaluate machinery and equipment. One valued the machinery on a "where-is, as-is" basis. We understand his values, however, not to be "use-in-place" values but the value to a buyer coming in to buy and remove. The other purported to state the fair market value of the items. He testified that his appraisal was "based on a purchaser taking out of there without adding freight and costs of installation." He further testified that his appraisal "was not based on the value to the owner in place." This witness' testimony is not clear to us, and we place no reliance upon it.

The other witness for plaintiff who testified to the item-by-item valuation was Mr. Anderson, an appraiser whose qualifications were at least equal to those of Mr. Ensign. This witness and his "team" spent four days at the plant and listed a true value figure for every piece of machinery and equipment which formed a part of the plant. His values were derived from reproduction cost new less depreciation or the cost of replacing the item, this being based upon market data for similar used machinery. He valued the units installed and functioning, and took into account the depreciation and trended for inflation.

---

[11] Recall from our earlier discussion that Mr. Ensign consistently asserted that the value for special functional obsolescence may be considered only under the replacement cost technique.

Plaintiff's other witness whose testimony requires attention here was Mr. Barnett, plaintiff's plant engineer. He estimated that by reason of layout the plant was only 30% efficient in its material handling capability and testified that this was reflected in excess labor costs and investment in forklifts. He opined that from "raw material in" to "finished product out" wood might travel from one and one-quarter to one and three-quarters miles. He testified that the problem could not be cured by moving machinery around in the original building because the cost would be too great.

Maps and diagrams were put into evidence through this witness. One was a diagram which had been prepared in May, 1974, for the State Department of Environmental Quality. He testified that it represented the condition of the plant on January 1, 1974. Another diagram was a "color graphic" describing the flow of materials through the manufacturing process. An examination of the exhibit bears out the witness' testimony that the plant is inefficient because of the location of storage areas and the misalignment of machinery.

This witness had prepared another diagram which showed an

> "* * * approximate layout of existing equipment on a different floor plan with a piece of blank ground, showing the different process storage areas and processing areas and how they would relate to each other and trying to achieve a good efficiency."

This would be using the same equipment in a different plant scheme and layout with the same amount of floor space. The witness explained how such a layout would reduce wood travel through the plant to approximately 1600 feet as compared to "6000 some odd."

Mr. Barnett then testified in considerable detail as to just how that layout would permit reducing the work force by 21 men and five forklifts. Neither this

witness nor anyone else to his knowledge had calculated the cost of this "optimum" plant.[12]

The plaintiff's chief executive officer testified that the existing plant could not be abandoned to build a more efficient plant on the site because of economic reasons and the necessity of keeping the plant in operation for economic survival. He further testified that one in this business would expect to make about an eight percent return on investment and expect to recover the investment in ten years.

Plaintiff called Mr. Wright, plaintiff's plant superintendent, who testified that the material flow problems entailed extra labor cost, and that the flow problems could not be cured without completely abandoning the existing plant. He further testified that the flow problems caused loads of lumber to be picked up additional times, causing forklift damage to the lumber. He noted further lumber and product damage by reason of narrow aisles. He estimated that with proper layout $21,000 per month could be saved in damage loss for injury in handling.

Plaintiff also called Mr. Stewart, who was Mr. Anderson's superior in an appraisal company for which both worked. Mr. Stewart's credentials were at least as impressive as those of Mr. Ensign. He had been in charge of the overall appraisal which the company had been hired to perform for plaintiff. Mr. Stewart testified that defendant's appraisal reflected "quite fairly" the value of the buildings and, therefore, accepted those figures. However, he took strong issue with defendant's theory with respect to the impact of

---

[12] It is defendant's contention that there is no validity from an evaluation standpoint in comparing the labor and equipment costs of operating the optimum plant with those necessary to operate the subject plant, unless the "negative value" thus obtained is deducted from the replacement cost of the plant. Since the replacement cost of the plant was not calculated, defendant asserts special functional obsolescence cannot be considered, for there is no proper figure from which to make the necessary deduction. We shall discuss this later in the body of the opinion.

special functional obsolescence.[13] He testified that he did not "specifically observe" any misalignment[14] of machinery and equipment but that he did notice problems with the flow of material. He was of the opinion that this flow pattern resulted in an

"increase in operating costs over what they would have been for basically the same equipment in a more efficient layout."

The witness continued his testimony with respect to two of the diagrams to which we referred earlier.[15]

"Q   Exhibit 4?

"A   That's correct.

"Q   Would you like to refer to this during your answer?

"A   Yes. Now, as been testified to before, this — I didn't recognize all the complications and I realize that there was a very poor product flow and raw material storage and it's quite fairly represented by this Exhibit No. 4.

"Q   All right. Incidently, was that Exhibit 4 initially prepared by you or under your direction?

"A   It was prepared by Mr. Anderson under my direction and was — the internal flow pattern was superimposed by Mr. — Mr. Bill Barnett.

"Q   All right. As to the internal flow pattern superimposed by Mr. Barnett, is that generally in accordance with what you observed?

"A   Yes.

"Q   Do you believe that this flow pattern problem resulted in an increased — increase in operating costs over what they would have been for basically the same equipment in a more efficient layout?

"A   I do.

"Q   And what was your conclusion on that?

---

[13] It is to be remembered that this witness uses "functional obsolescence" for what we are terming "special functional obsolescence."

[14] This is somewhat puzzling in light of an answer the witness gives which we shall quote shortly.

[15] Exhibit 4 refers to the "color graphic" flow chart for the existing plant and Exhibit 6 refers to the plant designed by Mr. Barnett to use the existing equipment in a different floor and plant layout in the same amount of floor space and square feet in the yard.

"A   Well, it wasn't my conclusion. It was Mr. Barnett's and the members of in-plant staff that developed excess labor — labor by misalignment, excess capital expenditures by additional forklifts not required in a properly aligned plant and the possibility of a percentage of gain in raw material — or in material occasioned by the excessive handling.

"Q   Did you — did you consider this problem in arriving at a final opinion as to the fair cash market value of the improvements?

"A   I did.

"Q   Is this — is this a matter that's properly described as functional obsolescence?

"A   That is correct.

"Q   Could you explain in a general way what your understanding of functional obsolescence is?

"A   Well, functional obsolescence is obsolescence usually occasioned by misalignment of machinery and equipment and it's inherent within the plant and it's either curable or incurable. In this case it's economically incurable.

"Q   Could you explain why you believe it's economically incurable in this case?

"A   Well, as a practical matter, anything can be cured by — with the limitation of the site, if the site will accept it by rearranging it. But that, in this case, would involve remove — demolishing everything they have there and rearranging it and, therefore, I think everyone can understand that it is economically incurable.

"Q   All right. Have — have you had an opportunity both in and out of the Court to review Plaintiff's Exhibit 6, this proposed or hypothetical layout of a — of a more efficient plant at the same site?

"A   I have.

"Q   Now, assuming, Mr. Stewart, that Bend Millwork or any other owner for that matter was starting out with — with an empty plot of ground of this size and configuration, do you have any — do you have an opinion as to whether there'd be any substantial difference at any given point of time to install a plant as depicted on Exhibit 6 and the actual layout as shown on Exhibit 4?

[600]

"A No, at any point in time, the exhibit prepared by Mr. Barnett would probably cost in buildings less than the existing plant due to the fact that it's divided up into one, two, three, four, five buildings. This is in two buildings and just the ratio of walls to floor area, and it's approximately the same area, would indicate it would probably cost less.

"Q All right. However, when starting with the existing buildings as shown on Exhibit 4, as I understand it, this is an altogether different situation?

"A That's correct.

"Q I believe you heard the testimony by Mr. Barnett and Mr. Wright that they estimated that if the plant could be realigned generally as shown on Exhibit 6 that there would be a saving of — I believe they concluded 21 positions. Did you hear that testimony?

"A I heard that, yes.

"Q In your calculation of functional obsolescence, did you — what figure did you use as far as potenial saving in employees?

"A Well, I used a figure of 20-man years and that apparently is an error in communication, * * *."

From wage data in evidence Mr. Stewart calculated the figure which in his opinion was to be deducted for special functional obsolescence. He assumed a saving of 20 men at $12,000 annually for a figure of $240,000. This was reduced by 50% for the effect of other than ad valorem taxes leaving annual savings to the taxpayer of $120,000. He used Mr. Pozzi's eight percent rate of return over a ten-year period to obtain a present worth multiplier[16] of 6.71. The product of 6.71 times

---

[16] Note that Mr. Ensign used a multiplier of 4.486 because he used a nine percent return over a period of six years. There are tables, of course, based upon mathematical calculations which yield a given multiplier for a given rate and period of time.

Plaintiff's appraiser, Mr. Stewart, testified that defendant's six-year life is based solely on the reappraisal cycle, as defendant states in its appraisal report, and that just because appraisals are done every six years does not mean that the economic life of the plant was that duration. Mr. Stewart's determination of a ten-year life is justified on the basis of the

$120,000 is $805,200, which is the figure for this item presented in Mr. Stewart's original testimony to the tax court. This testimony was later amended to assume a savings of 21 men and 5 forklifts thus yielding a commensurately higher figure, which in turn became part of the figure set forth for "Functional Obsolescence of Plant Layout" found in the respective vaulation tables set forth early in this opinion.

Mr. Stewart testified that in his expert opinion a "willing and able prospective purchaser of this plant" would consider obsolescence of this kind and would discount the "depreciated cost" in arriving at a value of the plant. Furthermore, he testified that the method he used to arrive at his final valuation figure was a "generally accepted method." In defending his method under cross-examination, he stated explicitly that it was not necessary in determining the added cost (of doing business) to make a comparison with another plant; nevertheless, he conceded that it was necessary to know that the "Exhibit 6 plant" would cost less than the existing plant. Moreover, under further cross-examination he conceded that a knowledgeable purchaser would, in order to determine price, compare the subject plant with some alternative. Yet, on rebuttal, he testified on direct examination that special functional obsolescence "is properly applicable in appraising by means of the cost method using the reproduction cost approach." In this respect he asserted:

> "My opinion is that the cost approach is reproduction cost, where possible, less depreciation from all causes, physical, functional and economic."

plant's executive officer's expectations. Defendant did not directly rebut plaintiff's arguments, but rather explained its own six-year life determination in that it would re-evaluate the functional obsolescence after six years, at the next appraisal date. We find basing economic life on the appraisal cycle to be arbitrary, particularly here where the layout problem is essentially permanent.

As for the difference in salaries, with plaintiff using $12,000 and defendant using $13,000, the parties would probably prefer to switch figures. In reviewing the record we find that plaintiff did, in fact, give evidence on how it determined $12,000. Since defendant did not rebut this testimony, we accept plaintiff's salary figure.

[602]

and that this included obsolescence arising from the nature of "machine itself and from the plant layout."

We now must weigh the evidence. Plaintiff exhorts us, as respondents always do in cases of de novo review, to give great weight to the findings of the court below and reminds us that the trial court is in much better position to determine credibility of the witnesses. This case was briefed before our opinion in *Medical Building Land Co. v. Dept. of Rev.,* 283 Or 69, 582 P2d 416 (1978); therefore, the parties had no opportunity to observe the flag we there hoisted concerning the weight to be given the findings of the tax court. For the reasons we stated there, we attach no weight here to the findings below. See *Medical Building,* 283 Or at 74, 582 P2d at 419. In weighing the evidence we first note that the expert witnesses seem to us to be equally well qualified. Of course, this only makes the task more difficult.

There are several factors in plaintiff's favor. Plaintiff's appraisal team had the advantage of spending considerably more time at the plant than did Mr. Ensign. They had an advantage of having available an appraisal done by their company for the taxpayer for fire insurance purposes in 1971. Mr. Ensign had made an earlier appraisal report upon which he based his testimony before the department at a hearing in 1975. At that time he utilized only the cost approach, and developed his "bottom line" figure as follows:

> "The appraisal estimate was arrived at by utilizing the investment data supplied by the company. Since the 1969 cost of acquisition substantiates the True Cash Value as computed by the Department of Revenue for that year, it was used as the starting figure. For each succeeding year the value was computed by deducting the retirements, trending for annual price level changes, adding capital investments and depreciating for the estimated loss in value."

By this method he arrived at a January 1, 1974, figure of $2,140,000, which is the exact figure he arrived at

by his December, 1976, appraisal method in which two cost approach techniques and a market data approach were correlated. At least four inferences are possible: (1) coincidence, (2) accuracy of the two separate appraisals is mathematically demonstrated, (3) the 1976 appraisal was predestined to arrive at the same figure as the 1975 effort, or (4) the 1976 appraisal was designed to meet someone's concept of the need to apply the same method as was used in *Publishers Paper Co. v. Dept. of Rev., supra.*

On the other hand, it appears that Mr. Ensign relied to a greater extent in arriving at the final figure on his own observations than did Mr. Stewart. For example, Mr. Ensign estimated excess labor costs of 15 men by his own on the scene observation. Mr. Stewart relied upon figures developed by three employes of plaintiff. Apparently the same kind of coincidence as we noted above for Mr. Ensign's work is apparent in Mr. Stewart's product, which found the exact same figure for special functional obsolescence for both years although the evidence shows changes in the plant and in the work force.

We have had occasion in the past to note some aspects of judging the value of expert testimony. For a recent case see *Jones v. Jones,* 276 Or 1125, 1129-30, 557 P2d 239, 242 (1976), where we noted earlier cases and quoted from *Baber v. Caples,* 71 Or 212, 221, 138 P 472, 1916C Ann Cas 1025 (1914), in turn quoting from I Taylor on Evidence § 58 (8th ed):

> " 'Perhaps the testimony which least deserves credit with a jury is that of *skilled witnesses.* These gentlemen are usually required to speak, not to facts, but to *opinions;* and, when this is the case, it is often quite surprising to see with what facility and to what an extent their views can be made to correspond with the wishes or the interests of the parties who call them. They do not, indeed, willfully misrepresent what they think; but their judgments become so warped by regarding the subject in one point of view that, even when conscientiously disposed, they are

incapable of expressing a candid opinion.' " (original emphasis)

It is not only in the field of appraisal that these problems arise. They appear in cases involving medical "science," engineering "science," and other fields where it would seem there would be little room for difference of opinion as compared to the field of appraisal.

We here reach resolution of the issue of the effect of special functional obsolescence in this case. Defendant argues that the figure for special functional obsolescence can only be deducted from the replacement cost of the plant. On its case in rebuttal the taxpayer assumed the existence of a replacement cost plant which was so efficient that there would be a savings of 93 workers. Capitalizing the figure thus obtained and deducting it from the assumed replacement cost of the plant yielded a minus value as the value of the subject plant. This is absurd, and it was introduced to discredit defendant's replacement cost method, but it also demonstrates what tinkering with figures can produce.

■■  In this case the deduction of excess operating costs of the special functional obsolescence of the plant layout is properly made from plaintiff's reproduction costs. As discussed above, we have found that plaintiff's appraisal method and valuation of the property are preferable to that of the defendant. We believe that a prospective purchaser of this plant, assuming that he would have a valuation done of the land, buildings and machinery and equipment on an item-by-item basis and would perceive that the entire plant, *as a plant,* has layout problems which result in excess material handling and other operating costs, would not be willing to purchase the plant for the sum total amount obtained by adding together the value of the parts of the plant. The use of excess operating costs is satisfactorily adequate here to measure the deduction.

Defendant contends, though, that these operating costs are in *excess* only when compared to something

else and that the costs of that something else, minus the excess operating costs, is required in order to determine whether a potential buyer would in fact pay less for the existing plant rather than, say, build a model alternative.[17] Presumably defendant's argument is that should the cost of the alternative model plant, minus excess operating costs, be greater than the reproduction cost of the existing plant, the value of the existing plant would in fact be greater than the sum of the reproduction cost of the parts of the plant. That is what defendant found with its replacement cost technique. Presumably defendant's view is that since the focus is on how much a person would pay to reproduce a plant, and since it would be at least as much as it costs to build, the reproduction cost is the minimum cost of the plant. At least here with this plant we do not believe that to be the case. Defendant's approach also does not seem to allow for any layout deduction under the reproduction cost method, even where a layout problem exists and a potential buyer would thus not pay the total of the sum of the parts.

One further questionable contention by defendant is that the excess operating costs should only be deducted from the *replacement* cost of the plant. It is not clear, though, why the replacement cost would be required. If something other than the reproduction cost of the existing plant is required from which to make the layout deduction, it would be the reproduction cost of the model layout plant, not the model

---

[17] Note the possible shifts of perspective in seeking to determine the value of property through the eyes of a potential buyer/builder using the cost summation approach. The perspective of a potential buyer is used because the goal of "true cash value" as defined by ORS 308.205 is the "market value as of the assessment date." Yet with the cost summation approach, the focus is not only on what a potential buyer perceives as the value of the *existing* plant, but also on what the cost of *reproducing* or building the plant would be. In addition, this potential buyer/builder might be expected to consider not only reproducing the existing plant but also replacing it with an ideal plant. Still, the perspective of a potential buyer is useful to determine or check on whether the particular cost technique used to determine value appears reasonable for the particular property at issue. A plant layout problem is one such element the potential buyer would take into consideration.

layout plant replacement cost with entirely new machinery and equipment. Such new machinery and equipment were not represented in the model plant in this case when that plant was compared to the existing plant to determine the effect of the inefficient layout, and to have included such equipment here would have altered the measurement of the difference in *layout* operating costs between the model and existing plants. Though a potential builder might have in mind the most modern plant with the most ideal layout, at some point the relevance to the value of the existing plant becomes too attenuated.

■  We need not decide here whether it was necessary to have made the special functional obsolescence layout deduction from the cost of the model plant, since Mr. Stewart effectively argued that the cost of the model plant would, if anything, be less than that of the existing plant. If it is less, then the existing plant's cost may be used in the calculations. *Compare Publishers.* Mr. Stewart explained that the model plant would be less costly "because it would be confined to two buildings with a lower ratio of walls to floor area" and "[t]he equipment would be no different 'cause the installation cost would probably be less because it would be concentrated in proper locations." We accept Mr. Stewart's explanation, particularly in light of no adequate rebuttal by defendant.

■  We find there are layout problems which cause excess material handling costs in the operation of the plaintiff's plant. We find *on the record in this case* that a deduction should be made from the value of the components of the plant, as a plant. On the other hand we find the evidence concerning injury to the lumber in excess handling and from narrow aisles to be too general for us to allow any deduction. Neither are we convinced that all of the labor and forklift savings plaintiff urges could be achieved.

[607]

As we did in *Publishers,* therefore, we shall proceed to an item-by-item consideration of those savings.[18] In discussing the evidence we shall refer to the diagrams already mentioned. Exhibit 5 is the diagram which was prepared for the Department of Environmental Quality. Exhibit 4 is the "color graphic" flow chart. Exhibit 6 is the realigned plant using the same machinery and equipment and occupying substantially the same amount of floor space.

Plaintiff contends that the correction of the plant's layout problems, essentially material flow difficulties, would result in the savings of 21 people and 5 forklifts. The savings in people may be broken down into groups of 9 forklift drivers, 2 chasers, 6 foremen, 2 operators, and 2 mechanics.

The reduction of 9 forklift drivers is from an original group of 20, and the 5 forklifts from a total of 26. The savings come at several points in the manufacturing process. For the yard and ripsaws, out of 3 drivers in the day shift and 2 in the swing shift, one from each shift is eliminated, as well as one forklift. The savings result from a move of the storage area to a place near the railroad receiving area, and a move of the ripsaws to a place near the storage area.

There are several difficulties with this analysis. First, plaintiff's Ex. 5, which shows the layout of the machines and buildings of the existing plant as of January 1, 1974, does not indicate a significantly greater distance of material flow of the raw material to the ripsaws. Even assuming there is some greater distance, though, more significant problems exist with the new raw material storage and ripsaw locations. One problem is with the credibility of the evidence in general, and the other concerns difficulties with truck transportation and delivery.

---

[18] If we did not do it the tax court would have to do it. Since the matter is before us de novo and our own thinking is fresh in our minds, we reject the temptation to shift the task to another. We mention the matter only to question the policy inherent in the legislative scheme.

Plaintiff's Ex. 5 shows raw material moving from the railroad receiving spur, at the west end of the site, to nearby lumber sheds. No raw material delivery by truck is indicated on the chart. Plaintiff's Ex. 4, however, which was developed to show material flow patterns through the existing plant, indicates raw material moving from the railroad spur not to the lumber sheds, as in Ex. 5, but all the way across the plant to "Raw Material Storage" at the east side of the yard, which wasn't marked as such in Ex. 5. The sheds in Ex. 4 seem to house "material in process," rather than raw material. Another bothersome point with regard to the handling of raw materials is that while the exhibits just show the receipt of raw material by rail and its transfer from that point, and while Mr. Barnett testified that he didn't really know but that he thought probably 15-25% of the raw material came in by truck, plaintiff's appraisal report states that 60% of the raw materials arrived by truck and 40% by rail car. Asked if it would make any difference to the design of the plant if all the material arrived by truck, Mr. Barnett said the design would be the same. However, plaintiff's Ex. 6 showing the ideal layout shows raw material storage by the railroad spur, on the west side, without any indication how trucks entering the plant site from the only access road, which is on the east side, will even get to that point. Though no road is shown on Ex. 6, trucks could apparently drive through the middle of the plant site between the two buildings, to reach the storage area, although this would create the congestion which plaintiff supposedly eliminated in the model plant. The deduction for the two drivers and the one forklift for the yard and ripsaws is not allowed.

The next point in the manufacturing process at which plaintiff suggests savings is at the cutlines. Some materials from the ripsaws are transported to the cutlines, and a comparison of Ex. 5 and Ex. 6 does indicate a substantial reduction in material handling distance. Also, the fingerjointing machines are

coupled directly with the cutlines "so that the materials are no longer handled by forklifts." Out of two drivers during the day and two at night, one from each is eliminated along with one forklift. A critical problem, however, exists with plaintiff's plans. The workers and forklift are not only eliminated, they are replaced, according to Mr. Barnett, by a conveyer system between the cutlines and fingerjoints. A fundamental premise of the comparison of the existing and model plants in order to measure the *layout* problems is that the equipment be the same. There is no way for this court to determine the cost comparison of two drivers and forklift with a conveyer. The deduction for the two drivers and one forklift for the cutlines is not allowed.

From the fingerjoint machines, according to Ex. 6, the material is moved to an in-process storage area and then on to the moulders. A reduction of two drivers, one from each shift, and one forklift is suggested. The reason for the savings is presumably because of the location of all the moulders together, rather than scattered about in order to match up with the individual fingerjoint machines, as in Ex. 5, and because of the proximity of in-process storage to both the moulders and fingerjoints. The reduction of two drivers and one forklift is allowed. For the same reasons, the two drivers and one forklift are allowed for the tennoner department.

From the tennoners, the material moves to the vinyl wrap department. The one driver and one forklift are supposedly saved because of the "close proximity to the tennoner driver." However, the vinyl wrap department isn't even indicated on Ex. 5. Further, the tennoners are shown to be very close to the loading dock, and presumably so is the vinyl wrap department. The reduction of the driver and forklift is not allowed.

The proposed reduction of two chasers results from the placement of in-process storage next to the machines at which such material will be used. With

the existing plant, the in-process storage is in buildings separate from where the machines operate, and the two chasers are used "to keep that material organized in a fashion that it can be found again." This deduction is allowed.

Of the six foremen reduced, two are from the ripsaws and cut lines. Out of three foremen currently in that area for each shift, one is eliminated. In the fingerjoint department, one foreman is reduced from each shift, out of three in the day shift and two in the swing shift. The last two foremen saved are one each out of currently two in the day shift and two in the swing shift.

The rationale for these savings is that the reorganization of equipment and the elimination of some walls in separate buildings permits the foremen to supervise larger areas and more men. The supervision is to keep the personnel working, to meet production and work quality levels, and to make sure that the machinery and equipment are operating correctly. In its cross-examination defendant asked if all these duties themselves were the time-consuming factors, rather than distance traveled, but plaintiff's witnesses effectively responded that the foremen's presence and authority to make decisions on matters were the key factors. Because the machines are so spread out in the existing plant, the reduction of the six foremen appears reasonable and is allowed.[19]

---

[19] This case was complicated enough without having to review de novo a record which included testimony, which this court obviously cannot watch, as that of Mr. Barnett describing the location of foremen in Ex. 5.

"These — we have a ripsaw here and here. Maybe I can turn it around a little bit. We have a ripsaw here and here and a cut line over here. These are fairly remote to each other and it requires duplicate personnel because this guy can't really go here to here to here and supervise those people. If you don't watch them they don't do their job. We have to have two on each shift to take care of it. We have one in this location and one in this location. They kind of run back and forth between these different locations."

This testimony was typical, and was not the fault of the witnesses. Appellate criticism of this kind of record is not new. *See,* for example, *Brooke et ux v. Amuchastegui et ux,* 226 Or 335, 360 P2d 275 (1961) and cases there cited and cited in the cited cases.

The claimed savings of two operators is the result of reducing one operator on day shift and one on swing shift from the fingerjoint department. The explanation is that one fingerjoint machine "could be incorporated with another machine in close proximity which would save us a man each shift there." It is true the fingerjoint machines are moved much closer together in the model layout, and that two operators could be saved because of the proximity. The reduction of two operators is allowed.[20]

The final proposed savings of the model plant are two forklift mechanics. Because a cutback of only two machines has been allowed, a reduction of only one mechanic is allowed.

The total of allowable reductions is 15 people and two forklifts. We find the value of special functional obsolescence is $644,160 for 1974.[21]

In summary, the value of this property as of January 1, 1974, is $1,589,390 and as of January 1, 1975, it is $2,279,740. The January 1, 1974, value is determined by adding the $900,500 for the buildings and structures to the $1,333,050 for the machinery and equipment and deducting the layout special functional obsolescence value of $644,160. The January 1,

---

[20] We note once again that plaintiff's evidence is not as good as it could have been. Plaintiff's Ex. 5 shows four present fingerjoint machines and one future machine site, but plaintiff's Ex. 6 shows six fingerjoint machines. The increase of two fingerjoint machines isn't critical, though, in the sense that any savings are the result. This problem also existed with the moulders, with nine shown in Ex. 5 and 14 in Ex. 6. This difference is not critical, however, because the manpower saving is not related to the extra machines.

[21] This consists of $603,900 for the personnel and $40,260 for the forklifts. Plaintiff determined a value for the five forklifts by taking an average cost of $15,000, a five-year life with a 20 percent residual for a depreciation expense of 80 percent of $15,000 per year, or $12,000, plus $6,000 operating cost per vehicle. Apparently plaintiff treated the $12,000 figure as representing the five forklifts, because with it added to the $30,000 of operating costs, plaintiff found a value of $42,000. 50 percent of that was found to be the after tax effect, and $21,000 times the multiplier of 6.71 resulted in a value of $140,700 for the five forklifts. For the two forklifts, however, we recognize only their operating costs. The after tax effect of $6,000 times the multiplier of 6.71 results in a value of $40,260.

1975, value is determined by adding the $1,194,140 for the buildings and structures to $1,729,760 for the machinery and equipment, and deducting the layout special functional obsolescence value of $644,160.

As in *Publishers,* the methodology used here to determine the value of the property should not necessarily be held the standard in assessments of other property. One of the reasons we have gone into such detail in discussing the theoretical assumptions behind the terminology and cost computations is to give an indication of the kind of analysis and explanation we expect of parties arguing such cases in the future. Arguing facts and pointing out how the other side's position is not consistent with one's own are of very little benefit to this court unless the theoretical assumptions that underlie the positions and that give rise to the "facts" are explained.

Modified and remanded to the tax court for entry of a decree in accordance with this opinion. Costs to neither party.