Argued January 3, modified and remanded June 5, 1979

# BROOKS RESOURCES CORPORATION,
*Appellant,*

*v.*

# DEPARTMENT OF REVENUE,
*Respondent.*

(TC 989 and 1088, SC 25694, 25698)

(Consolidated Cases)

595 P2d 1358

James V. Hurley, Bend, argued the cause for appellant. With him on the briefs were Neil R. Bryant, and Gray, Fancher, Holmes & Hurley, Bend.

Alfred B. Thomas, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was James A. Redden, Attorney General, Salem.

HOWELL, J.

## HOWELL, J.

This is an appeal from a decree of the Oregon Tax Court fixing the value of an 18-hole golf course at Black Butte Ranch, a planned unit development in Deschutes County. The Tax Court decreed the true cash value of the course to be $840,000 as of January 1, 1974, and $950,000 as of January 1, 1975, and the taxpayer appeals. We review de novo. ORS 305.445, 19.125(3).[1]

The basic facts are largely undisputed, although the parties differ over the conclusions to be drawn from those facts. Black Butte Ranch is a planned unit development subject to a master plan filed with Deschutes County. The plan calls for 1,250 homesites on 1,550 acres when the development is complete. In addition to the homesites, the development includes an 18-hole championship golf course, portions of which are shown on the filed plats and portions of which are used to meet density requirements imposed by Deschutes County.

Owners of lots within the development enjoy certain rights with respect to the golf course. Although they must pay greens fees, they are not charged an additional membership fee for the right to use the course. The taxpayer's contract[2] with the lot owners provides that while the amount of the fee is solely within the control of the taxpayer, lot owners will be charged only 80 per cent of that fee. Additionally, lot owners and their guests are guaranteed first access to the course, to the total exclusion of nonmembers, if

---

[1] ORS 305.445 provides:

"* * * review of final decisions and final orders of the tax court shall be in accordance with procedures in equity cases. * * *"

ORS 19.125 provides:

"Upon appeal from a decree in a suit in equity, the case shall be tried anew upon the record."

[2] There is a difference between the parties to this case as to whether the rights of the lot owners are contractual or whether they are in the nature of an easement. It is not necessary that we label these rights, however, in order to decide this case.

necessary. The management also guarantees that the course will be kept in good condition and that the use of the land as a golf course will never be terminated. Convention participants are not allowed on the course.

These promises and representations were made by the taxpayer in order to make the homesites in the development more attractive to prospective purchasers. According to the taxpayer, the effect of this has been to transfer the value of the golf course to the adjoining lots. The taxpayer therefore contends that the golf course should be given a zero value for property tax purposes.

The taxpayer relies mainly upon our decision in *Tualatin Development v. Dept. of Rev.*, 256 Or 323, 473 P2d 660 (1970), as authority for urging a zero valuation in the golf course for property tax purposes. In *Tualatin,* the taxpayer was the owner of an unprofitable golf course that was part of a planned adult residential community. The court found that the property on which the golf course had been constructed was so restricted by means of easements or estoppel that

> "[i]t was clearly of no economic benefit to plaintiff, nor [was] there anything in the evidence to indicate that it would have been of value to anyone else. There was no market for the land, and plaintiff's offer to donate it to the City of King City was refused." 256 Or at 332.

Accordingly, this court agreed with the Tax Court that the property should be given a zero valuation for property tax purposes.

■ We have reviewed the record in the present cases and conclude that the reasoning we applied in *Tualatin* is not applicable here. Although the Black Butte course showed an accounting loss during the years 1972 through 1976, the size of the loss decreased each year. According to defendant's appraiser, moreover, significant portions of the yearly losses were a result of accounting deductions that could not be used under

an income valuation approach. The taxpayer offered no expert testimony to support its position that the golf course would continue to be unprofitable in the future. In fact, the only person who actually testified that no money could be made on the course was Gene Mason, the course director. Although Mr. Mason's credentials as a golf pro appear unassailable, there is no indication that he would qualify as an expert witness in accounting or real estate appraising. On the record before us, we conclude that the taxpayer has not shown that the Black Butte course has no value.

The taxpayer contends that even if we reject its contention that the course has no value, it is still entitled to some modification of the Tax Court's decree because the amounts fixed by that decree do not represent the "true cash value" of the course within the meaning of ORS 308.205.[3]

■■ We have observed in previous cases of this kind that there are three standard approaches to valuation: the market data approach, the income approach, and the cost approach. *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 592 P2d 986 (1979); *Medical Building Land Co. v. Dept. of Rev.,* 283 Or 69, 582 P2d 416 (1978); *Swenson v. Dept. of Revenue,* 276 Or 1, 553 P2d 351 (1976). The appropriateness of a particular valuation method or combination of methods is not determined by fixed principles of law, but is a factual

---

[3] ORS 308.205 provides:

"True cash value of all property, real and personal means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property. * * *."

Department of Revenue Regulation 150-308.205(A)(1)(a) provides:

"Market value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

determination that depends on the record developed in each case. *See Medical Building Land Co. v. Dept. of Rev., supra* at 78-79. Because we try this case "anew upon the record,"[4] we must determine which of the above approaches to valuation, under the facts of this case, best reflects the "true cash value" of the property. In making this determination, we emphasize that we are performing our function as fact-finder, not our function as a corrector of legal errors.

The record in this case is not as well developed as might be desired. Because the taxpayer took the position in the Tax Court that the subject property had no value, it offered no evidence as to the value of the property under the three traditional approaches previously mentioned. In fact, the taxpayer produced no witnesses who could be considered experts in real estate valuation. We must therefore rely solely on the testimony of the Department's appraiser in determining the value of the property under the recognized approaches to valuation.

The Department's appraiser was Albert Kenney, a district manager of one of the Department's assessment and appraisal units. Prior to trial, Kenney compiled an appraisal report concerning the subject property. That report, which was offered and received into evidence, listed the following estimates of value for the golf course under the cost and income approaches to valuation:

|      | *Cost Approach* | *Income Approach* |
| ---- | --------------- | ----------------- |
| 1974 | $840,000        | $550,000          |
| 1975 | $950,000        | $560,000          |

The report stated that the market approach could not be used for the subject property because of a lack of comparable sales. The report also stated that, although it was possible to arrive at an estimate of value under the income approach, "an income history had not yet been established and, there is a high degree of

---

[4] *See* note 1, *supra.*

speculation involved in projecting three or four years into the future." Kenney therefore concluded that the cost approach was the proper method for determining the golf course's true cash value.

The Department contends that use of the cost approach is compelled by our holding in *Shields v. Dept. of Rev.,* 266 Or 461, 513 P2d 784 (1973). According to the Department, *Shields* "stands for the proposition that the cost approach is properly relied on in establishing value where the cost is recently invested and there is no earnings history nor comparable sales or [sic] a study of comparable properties evidencing a basis for an income approach." We rejected an analysis similar to this in *Medical Building Land Co. v. Dept. of Rev., supra,* where we observed that "the efficacy of each approach [to valuation] depends, of necessity, on the facts and circumstances of each case * * *." 283 Or at 78. The only "proposition" that our decision in *Shields* stands for is that the cost approach was a better measure of true cash value than the income approach *on the facts of that case. Shields* did not establish any rule of law to govern cases, such as the present one, which involve entirely different facts.

In *Shields,* the Department attempted to apply an income valuation approach to a newly developed regional shopping center. Under the facts of that case, the income approach resulted in a higher valuation than the cost approach. This court agreed with the Tax Court that in light of the lack of earnings history for the shopping center, the income approach was a less accurate measure of true cash value than the cost approach.

We agree with the Department that in the present case, as in *Shields,* the lack of earnings history and lack of comparable properties make the income approach to valuation speculative. It does not follow, however, that we must reject that approach as a *matter of law.* On the contrary, we may decide as a *matter of fact* that despite its inadequacies, the income

approach is a better measure of value than the cost approach with respect to the Black Butte golf course.

Although Kenney's appraisal report described the income approach as highly speculative on the facts of this case, he was able to come up with specific figures for both gross income and expenses. To compute gross income, he multiplied 12,800 weekend rounds by a $9.50 greens fee and 15,000 weekday rounds by an $8.00 greens fee.[5] He then added estimated income from cart rentals and shop sales for a total gross income figure of $278,000 for both 1974 and 1975. To compute operating expenses, he consulted a study by the National Golf Foundation which indicated an expense to income ratio of approximately 65 per cent for courses of the same type as the subject property. He then added personal property and land charges for total expenses of $217,848 in 1974 and $220,938 in 1975. Finally, he multiplied the net income to improvements by a capitalization rate that reflected the newness of the course and the fact that an investor would seek a higher rate of return in light of past earnings history. The product of these computations was an improvement value of $375,000 in 1974 and $360,000 in 1975, to which he added land values of $175,000 in 1974 and $200,000 in 1975.

■  While we afford Kenney's opinion concerning the unreliability of the income approach some weight, we are not bound by his conclusions in our capacity as

[5] The taxpayer objects to use of 27,800 annual rounds as an estimate in computing income because "uncontroverted evidence established that the maximum number of annual golf rounds is 25,000." The portion of the testimony on which the taxpayer relies, however, indicates only that the *taxpayer* does not intend to run over 25,000 rounds. We do not think the record supports the conclusion that another operator might not be able to run more rounds. Although Kenney's estimate of the maximum number of rounds, like his other estimates, was speculative, he testified that he took into account the shorter playing season at Black Butte in making that estimate. We therefore conclude that Kenney's estimate should not be varied in computing the golf course's value under the income approach. The relevant inquiry is not necessarily the number of rounds that the taxpayer will run, but the number of rounds that a potential buyer might expect to run.

trier of the facts. As we observed in *City of Portland v. Ruggero*, 231 Or 624, 373 P2d 970 (1962), "Expert testimony from its very nature is not proof of a fact. It is never more than opinion." *Id.* at 630, quoting *Avins v. Commonwealth*, 379 Pa 202, 108 A2d 788 (1954). *See also, Houghton v. Dept. of Revenue*, 261 Or 564, 495 P2d 715 (1972), applying this rule to a case involving property taxation. We appreciate Kenney's concerns over the unreliability of the income approach on these facts, but nevertheless conclude that under the peculiar circumstances of this case, the income approach is the best measure of the golf course's true cash value. It is apparent from a review of the record that Kenney's preference for the cost approach was less a function of that approach's desirability than it was a function of the undesirability of the income approach. There was substantial evidence that the taxpayer expected to, and has, in fact, recouped much of the cost of constructing the golf course, not from income produced by the course, but from sales of the surrounding homesites.[6] Kenney testified that in making his appraisal reports, he did not consider the rights the adjoining lot owners had in the golf course. Under these circumstances, we think the figure Kenney reached under the cost approach vastly overstates the true cash value of the property. We do not believe that a willing buyer[7] would agree to purchase this golf course, with its attendant restrictions, for what it cost the taxpayer to construct it. In fact, we think the significant difference between the estimates Kenney made under the income approach and the cost approach reflect the

---

[6] William Lee Smith, president of the taxpayer, testified that the golf course was built at a higher cost in order to increase the value of the adjoining property:

"We had options as to how to build a golf course and you can build a golf course without as many homesites fronting on it for less money. We chose to build a golf course with more homesites fronting on it and therefore maximized the number of homesites and therefore the value of the return to Brooks Resources in sale of homesites."

[7] Department of Revenue Regulation 150-308.205(A)(1)(a), note 3 *supra.*

inadequacy of the cost approach as a measure of true cash value in this case.

Accordingly, we find that the true cash value of the subject property is $550,000 as of January 1, 1974, and $560,000 as of January 1, 1975. This does not end our inquiry, however, because both these amounts exceed the values the Department pleaded in the Tax Court.

■ In its answer to the taxpayer's complaint, the Department asked that the Deschutes County Assessor's valuation of $486,700 on January 1, 1974 and $486,700 on January 1, 1975, be affirmed. On the morning of trial, the Department moved to amend its answer to reflect the cost values found in Kenney's report ($840,000 and $950,000). The Tax Court denied the motion to amend, but then allowed the Department to prove the cost based figures at trial. In its written opinion, the Tax Court held that the Department was not bound by the amounts pleaded in its answer, basing its holding on ORS 305.435, which provides in part:

> "* * * Where the determination of true cash value or the correct valuation of any property subject to special assessment is an issue before the court, the court has jurisdiction to determine such value on the basis of the evidence before it, without regard to the values pled by the parties."

The quoted portion of ORS 305.435 became effective on October 4, 1977. Or Laws 1977 ch 870, § 30. The trial in this case occurred on August 11 and 12, 1977. Despite the fact that the pertinent portion of the statute did not become effective until after the pleadings in this case were filed and the trial completed, the Tax Court believed it was compelled to apply the statute because it did not render its decision until after the provision became operative.

This assumption by the Tax Court was incorrect. There is nothing in the language of amended ORS 305.435 indicating a legislative intent to apply the amendment to valuation appeals in which the trial

occurred before its effective date. Absent such a directive, we assume the legislature intended to apply the statute prospectively only. *See Joseph v. Lowery,* 261 Or 545, 495 P2d 273 (1972) ; *Kempf v. Carpenters & Joiners Union,* 229 Or 337, 341-43, 367 P2d 436 (1961). As we said in *Kempf:*

> "\* \* \* Unless retroactive construction is mandatory by the terms of the act it should not be applied if such construction will impair exising rights, create new obligations or impose additional duties with respect to past transactions." 229 Or at 343.

■ The Department contends that application of ORS 305.435 to this case is proper because the taxpayer had an existing obligation in 1974 and 1975 to pay taxes on the true cash value of its property. We think, however, that the taxpayer also had a right to assume at trial that its maximum tax liability for the years involved in this appeal would not exceed the amount pleaded by the Department, since that was the law that existed at the time the trial took place.[8] It may well be that the taxpayer would not have pursued the appeal had it known its property might end up being valued at nearly twice the amount established by the county assessor. Under these circumstances, we think that applying the above-quoted portion of ORS 305.435 to valuation appeals that were tried before its effective date would "impair existing rights \* \* \* with respect to past transactions." *Kempf v. Carpenters & Joiners Union, supra.*

The Department relies on *Jones v. State Tax Commission,* 214 Or 392, 330 P2d 168 (1958), as authority for retroactive application of amended ORS 305.435.

---

[8] The Department disagrees with this proposition, contending that the Tax Court had the power to find a higher value than that pleaded by the Department even before the 1977 amendment to ORS 305.435. Our reading of the prior statute leads us to disagree. *See also Lethin v. Dept. of Revenue,* 278 Or 201, 205-06, 563 P2d 687 (1977). In addition, we think the legislature's decision to amend ORS 305.435 in 1977 to permit the Tax Court to do what it did in this case is at least some indication that the legislature did not intend the Tax Court to have similar power under the prior statute.

In *Jones* this court held that a statute allowing the State Tax Commission to inspect a taxpayer's books and records could be applied to allow inspection of books and records compiled prior to the effective date of the legislation. Although *Jones* was based in part on the "substance-procedure" distinction that we have criticized in subsequent cases,[9] we do not find that case inconsistent with our holding in the present case. Retroactive application of the statute in *Jones* did not frustrate any legitimate reliance on the part of the taxpayer. It is doubtful that the taxpayer's decision to keep records was made in reliance on the law existing prior to the statute's enactment.[10]

For these reasons, we hold that the 1977 amendment to ORS 305.435 does not apply to valuation appeals that were tried before its effective date. It follows that the valuation of the subject property must be reduced to conform to the amount alleged in the Department's pleadings ($486,700 for each year), even though the true cash value of the property exceeds that amount. The decree of the Tax Court, therefore, is modified and the case remanded for entry of a decree in accordance with this opinion.

Modified and remanded.

---

[9] *See Perkins v. Willamette Industries,* 273 Or 566, 542 P2d 473 (1975); *Joseph v. Lowery,* 261 Or 545, 495 P2d 273 (1972).

[10] It may be, of course, that an unscrupulous taxpayer might have falsified his records had he known they would be subject to inspection by authorities. That, however, is not the kind of "reliance on existing law" that we would consider to be legitimate.