BERNARD SHEVACH, Judge pro tempore.
 

 Plaintiff appeals from defendant’s Order No. VL 78-732, dated December 12, 1978. In that order, defendant, on plaintiff’s appeal from the valuation of a medical office building by the assessor of Multnomah County, determined that its true cash value was in the amount of $3,696,000 as of the relevant assessment date of January 1, 1977. In its complaint, plaintiff alleged that the true cash value of the subject property did not exceed $2,300,000 at the assessment date, whereas defendant by its answer contended that the value of the improvement of $3,696,000, as set forth in the order, should be sustained.
 
 [1]
 

 
 *[344]
 
 The subject property, constructed with brick-bearing walls and concrete floors, is a four-story medical office building with a gross floor area of 73,920 square feet, of which the net rentable area is 54,727 square feet. Two elevators service the structure, and the interior is well appointed with carpeted floors, acoustical tiled ceilings and good quality lighting fixtures. A covered walkway approximately 150 feet in length connects the building with the Portland Adventist Hospital. The structure does not have its own heating plant or air conditioning equipment but the services are supplied both to it and the hospital by a separate, central plant. At the trial, testimony disclosed that both plaintiff and defendant agreed that the office building was attractive and well constructed.
 

 The property is located in the southeast section of Portland, Oregon, approximately six miles from the downtown area. It is well situated, being in proximity with east-west crosstown arterials and approximately five blocks from the 1-205 Freeway. Also in proximity to the structure are a large shopping center, a commercial development, schools, residential and apartment developments. As of the assessment date of January 1, 1977, construction was complete except for minor particulars, and all available space was leased.
 

 At the trial, plaintiff and defendant each had an appraiser as a witness and, additionally, the vice-president for finance of the medical center testified for plaintiff. Both of the appraisers are able, experienced men, and are well qualified as expert witnesses.
 

 Plaintiff’s and defendant’s appraisers, in arriving at their respective valuations, each considered the three standard approaches to value; namely, the cost approach, the income approach and the market data approach. The objective of their considerations was to determine the true cash value of the building as of the assessment date within the intendment of ORS 308.205 and the statutorily mandated regulations of
 
 *[345]
 
 the Oregon Department of Revenue.
 
 [2]
 
 Their methodology was correct.
 
 Bend Millwork v. Dept. of Revenue,
 
 285 Or 577, 592 P2d 986 (1979);
 
 Medical Building Land Co. v. Dept. of Rev.,
 
 283 Or 69, 582 P2d 416 (1978);
 
 Brooks Resources Corp. v. Dept. of Revenue,
 
 286 Or 499, 595 P2d 1358 (1979).
 

 In its quest for true cash value, or market value, this court, as the fact-finder, must determine which of the foregoing approaches or combinations of approaches to value best resolves its inquiry. The particular approach or combination of approaches finally selected is not determined by fixed principles of law, but is a factual determination that depends on the record developed in this case.
 
 See Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 78, 79, and
 
 Brooks Resources Corp. v. Dept. of Revenue, supra,
 
 at 503,504.
 

 The three approaches will now each be considered.
 

 The theory of the market data approach is
 
 *[346]
 
 lucidly and succinctly stated as follows in Encyclopedia of Real Estate Appraising 23 (Friedman ed, 3rd ed 1978):
 

 "The
 
 objective
 
 in the Market Approach is to predict the most probable selling price of the subject property. The
 
 rationale
 
 of the Market Approach is that a purchaser will usually not pay more for a property than he would be required to pay for a comparable alternative property
 
 (principle of substitution).
 
 Furthermore, a seller will not take less than he can obtain elsewhere in the market. The
 
 method
 
 of the Market Approach is an empirical investigation in which the prediction of the most probable selling price is based on actual sales of comparable properties.”
 

 In the case at bar, plaintiff’s appraiser acknowledged that there were no recent sales of medical buildings directly comparable to the subject property. However, he did examine the sales of five dissimilar medical buildings and three other nonmedical buildings that, in his view, would qualify as alternative investments for a typical investor. The sales occurred between July 10, 1975, and March 6, 1978. Based on the market data approach, the appraiser concluded that the market value of the subject property would range from $2,275,000 to $2,425,000, although he noted that, in his own words, "comparable sales were not a conclusive indicator of value in this case because the medical buildings that had sold were all quite different from the subject * *
 

 In his testimony, defendant’s appraiser repudiated the market data approach for the reason that, as he stated, "* * * [m]y study of the market indicated that there simply had been no exchanges of buildings that were in any way comparable to the — to the subject.
 

 Although the market data approach is flawed by the paucity of data revealed by empirical investigation, nevertheless plaintiff’s comparable sales were supported by sufficient data to justify the finding of a value range of $2,275,000 to $2,425,000 as the market
 
 *[347]
 
 value of the subject property. In accepting this measure of value for this approach, the court heeds the following injunction of the Oregon Supreme Court in the case of
 
 Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 76:
 

 "Even if a particular approach is 'relatively weak and less supportable than other approaches,’ the approach should be used [considered] unless no data is available at 3.11 ^ ^
 

 The theory of the cost approach has been defined as follows in Encyclopedia of Real Estate Appraising,
 
 supra,
 
 at 65:
 

 " 'That approach in appraisal analysis which is based on the proposition that the informed purchaser would pay no more [for the subject property] than the cost of producing a substitute property with the same utility as the subject property. * * *’ ”
 

 Thus, the cost approach, like the market approach, is premised on the principle of substitution. Here, however, instead of the empiric employment of the sales data of the market approach, the appraiser is concerned with analytic comparisons of construction costs derived from the market for explanation and justification of his estimate for reproduction cost of the subject property. The final measure of cost in this approach is computed by deducting accrued and existing depreciation from the reproduction cost. To this effect,
 
 see Bend Millwork v. Dept. of Revenue, supra,
 
 at 605;
 
 Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 75, 76;
 
 Rogue Valley Manor v. Tax Comm.,
 
 244 Or 571, 573, 419 P2d 422, 423 (1966), and Encyclopedia of Real Estate Appraising,
 
 supra,
 
 at 67.
 

 Plaintiff’s appraiser testified that the reproduction cost of the medical office building was in the amount of $3,067,680 (exclusive of construction interest of $190,000) and that he derived the amount by referring to the cost of several medical buildings in Portland, by using data from a firm of architects, and by examining data from a service known at Cost Building Data
 
 *[348]
 
 Services. From the determination so made, he deducted functional obsolescence of $425,000 consisting of super adequacy in the brick exterior walls of the building and lack of efficiency in the space layout. He concluded that the brick wall facing, though substantially more costly than other types of exterior wall construction, would neither bring a higher rent nor a higher purchase price from a prospective buyer, thus resulting in nonutile costs of super adequacy; and he was of the further opinion that the deficient layout resulted in 74 percent of the total building square footage being available for rent, whereas the normative rental ratio of a typical modem building is 85 percent. Plaintiff’s appraiser thusly calculated that the cost approach yielded a value of $2,832,680 (inclusive of estimated construction interest of $190,000) for the improvement, exclusive of land costs.
 

 In verification of its appraisal, plaintiff submitted what it described as the actual construction cost of the building according to its cost payout records. The cost payouts, testified to by plaintiff’s vice-president for finance as having been carefully audited, were set forth in a letter from the vice-president to plaintiff’s counsel and in a tabulated breakdown of construction costs (PI Exs 4 and 5). Supplemented by trial testimony, the actual cost of the building, according to plaintiff, totaled approximately $3,200,000. This evidence is not convincing. Although the costs submitted were not challenged as erroneous, the question remains as to whether the costs accurately identified the
 
 total
 
 cost of building construction. The person who might have been the most cogent witness, namely the contractor, was not called to testify although hearsay testimony referring to his reputed cost breakdowns was offered. Additionally, the medical building constituted a portion of a $22,000,000 medical center project, and the vice-president for finance himself stated the following critique of the costs to which he had testified:
 

 "We identified that there could be an additional $108,000 of the — of the central plant [the central
 
 *[349]
 
 heating and air conditioning facilities] that might have applicability to the professional office building. However, I would hasten to add that, unless you would go back to every subcontract, which would require hours and hours of work, it’s — it’s almost impossible to identify every element of cost as it would pertain to the professional building versus the total medical center construction.”
 

 Plaintiff’s Exhibit 4 on its face also expresses uncertainty as to the reliability of certain building costs it purports to set forth. On this state of the record, the alleged actual building cost of $3,200,000 cannot be accepted as reliable substantiation of the reproduction cost of $3,067,680 (excluding construction interest) testified to by plaintiff’s appraiser.
 

 Defendant’s appraiser estimated that the reproduction cost of the medical office building was $3,696,000. He extracted this cost from market data including the use of the Marshall-Swift cost factor service and a calculation of the cost of other office buildings, including in particular a medical office building constructed two years before the subject property by the Good Samaritan Hospital in Portland, Oregon. By way of fortuitous happenstance, both appraisers had formerly evaluated the Good Samaritan building.
 

 Plaintiff’s appraiser testified that the Good Samaritan Medical Office Building and the subject property were "pretty comparable,” and defendant’s appraiser presented unchallenged testimony that both buildings were virtually identical in terms of office space, that their kind of construction was generally similar, and that the cost of the Good Samaritan building in 1975 was $46 per square foot. Defendant’s appraiser also specifically added:
 

 "The characteristic of the general finish of both structures is very similar. The — I would say good acoustical ceilings, generally good quality lighting, durable, if not excellent, carpeting, commercial grade, certainly insulated glass, good quality — two good quality elevators, I think actually produced by the same company. Both of
 
 *[350]
 
 them were four-story structures served by these two elevators. A generally attractive layout in both cases. Ease of parking. There are just many, many, many more areas of similarity between the two structures.”
 

 Adjusting the $46 figure by a time increment of approximately 11 percent, defendant’s appraiser computed the cost of the Good Samaritan building at $51.47 per square foot as of January 1, 1977. The Marshall-Swift cost service, which reflected construction costs derived from the local market, indicated a cost for the subject property of $50 per square foot as of January 1, 1977. From these data, together with the costs of other similar buildings, defendant’s appraiser deduced a replacement cost for the subject property of $3,696,000, reckoned at the rate of $50 per square foot. Defendant’s estimate of reproduction cost having been amply sustained by the evidence, the court accepts it. However, the court is of the view that the loss of rental area from a norm of 85 percent to 74 percent, occasioned by the building layout, represents incurable functional obsolescence equal to 10 percent of the reproduction cost and should be deducted from the reproduction cost. Plaintiff’s appraiser assigned this percentage for such loss and, although his concept of a functional obsolescence loss was challenged, neither his designation of quantum of rental area lost nor his percentage of reproduction cost reduction was disputed; furthermore, no facts presented by defendant rebutted his testimony that an 85 percent rental area is normative and that 74 percent of the subject property was in fact rentable. Accordingly, the court accepts a depreciated reproduction cost of $3,326,400 ($3,696,000 minus $369,600) as a result of the cost approach. The evidence does not sustain the inclusion of a super adequacy loss caused by brick wall exteriors, particularly because of defendant’s testimony that different walls would not have conformed to the hospital walls and the resulting aesthetic discord would have been a detriment to the medical office building.
 

 
 *[351]
 
 The last approach to value is the income approach. In this regard, the task of the assesssor is delineated in
 
 Assessing and the Appraisal Process
 
 50 (2d ed 1968):
 

 "The assessor/appraiser’s job is to estimate the amount of money which a typical prudent investor would be likely to pay for the right to receive all of the benefits of ownership of a specific property. In doing this he is using the third aspect of the principle of substitution: a property cannot have a value in excess of the amount upon which it is capable of producing a return consistent with that expected from investments with a similar risk. * * * The procedure followed in solving this problem is called the income approach to the value estimate.”
 

 The procedure used in this approach is to ascertain gross rentals, vacancy rates and expenses of comparable properties, and to apply to the resultant net income a capitalization rate. The capitalization rate, if possible, should reflect the ratio of net income to sales price of comparable properties sold in a time frame substantially contemporaneous with the valuation date of the subject property. The result of the process establishes the market value of the property.
 
 See Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 79, and discussion of income approach procedure in
 
 Mt. Bachelor, Inc. et al v. Dept. of Rev.,
 
 5 OTR 526, 529-532 (1974), rev’d and remanded on other grounds, 273 Or 86, 539 P2d 653 (1975).
 

 In the present case, both appraisers agreed that the rental market for comparable medical office buildings at the valuation date was $9.50 per square foot per annum, which was also the rental rate charged to tenants of the subject property. The total annual gross rental of the subject property would, at this rate, be in the amount of $519,906.50. The court accepts this figure.
 

 Plaintiffs appraiser found an annual vacancy rate of 8 percent for similar office buildings in the Portland market and defendant’s appraiser differed in his discernment of a vacancy rate of 5 percent. Since neither
 
 *[352]
 
 appraiser substantiated his opinion with factual detail, the court accepts the defendant’s 5 percent vacancy rate in that the plaintiff failed to sustain its burden of proof by the requisite preponderance of the evidence. ORS 305.427. The vacancy deduction is in the sum of $25,995.33.
 

 Defendant’s appraiser determined that operating expenses were $3 per square foot based on the experience reported by the local Building Owners’ and Managers’ Association for similar buildings in the Portland area. The plaintiff’s appraiser, in his appraisal report, particularized the various items of operating expense, assigned a cost to each item and identified his cost market data sources. He also included insurance premiums and set up replacement reserves for carpets, drapes, painting and decorating and parking lot maintenance. The court finds that the plaintiff’s computation was more studied and complete than defendant’s and merits greater credibility. Thus, plaintiff’s annual expenses of $195,840 are accepted rather than defendant’s computation.
 

 In their analysis of the applicable capitalization rate, both appraisers in their reports examined sales of allegedly comparable office buildings in the Portland metropolitan area and the annual net income of the buildings sold. The ratio of the annual net income of a sold building to its sales price was formulated and expressed in percentage terms as the capitalization rate. This method of deriving the capitalization rate from market data is acceptable.
 
 See Assessing and the Appraisal Process, supra,
 
 at 53. The accuracy of the rate so determined varies in direct proportion with the degree of comparability of the properties sold to the subject property: for example, the rate of investment return a prudent investor would require from the subject property would normally be less than that which he would accept from an older building of lesser quality by reason of the fact that an
 
 *[353]
 
 older building has a more limited time to return income and a lesser quality building poses a greater investment risk. Scrutiny of the sales submitted by the appraisers reveals, in the opinion of the court, that those of the defendant are more comparable to the subject property and consequently more worthy of acceptance in the fixing of the capitalization rate.
 

 In this regard, plaintiff’s appraiser offered six sales of medical and other types of office buildings with rates of return ranging from 8.47 percent to 14.9 percent in support of his selected capitalization rate of 9.5 percent. However, in his appraisal report, he candidly and commendably offered his own criticisms of the sales: as to one sale with a rate of return of 10.4 percent, he found that some of the rents were below market and "had the rent roll been more nearly in tune with market rent the resulting cap rate would have been below 10 percent” (PI Ex 3, at 55, 68); a second sale evidencing a rate of return of 10.58 percent, related to a medical building completely modernized in the year 1950 (PI Ex 3, at 45, 68); a third sale, with a rate of return of 14.9 percent, was made under duress, had a 25 percent vacancy rate at the time of sale, and, according to plaintiff’s appraiser, "conditions of sale appear to have influenced the price” (PI Ex 3, at 45, 68), and a fourth sale with a return of 8.47 percent was a small medical building of approximately 6,000 square feet (PI Ex 3, at 50, 68). The sale that appears most comparable to the subject property was a two-story modern office building completed in October 1976, and pre-sold in September 1975, with a sale rate of return of 9.11 percent. This building was located in an excellent suburban location (PI Ex 3, at 46, 54, 68).
 

 Defendant’s appraiser, urging a capitalization rate of 9 percent for the subject property, presented sales with rates of return ranging from 6 percent to 8.3 percent involving high-rise office buildings in downtown Portland. The sales examined, as in the case of those of plaintiff’s appraiser, occurred substantially in the mid-1970’s and encompassed structures of roughly
 
 *[354]
 
 the same construction age as those of plaintiff’s appraiser (Def Ex A, at Ex A).
 

 It is the court’s view that the lower rates of return of defendant’s sales are preferable to those of the plaintiff as a basis for selecting a capitalization rate for the following reasons: The most comparable sale of plaintiff reflected a 9.11 percent rate of return, certain of plaintiff’s other comparable properties were sold under conditions that did not accord with uncompelled transactions resulting from the interaction of able and willing sellers and buyers, and a sale pertaining to a significant property was substantially older than the subject, having been modernized in the year 1950. Defendant’s sales (Def Ex A, at Ex A) were not impeached by any testimony at the trial and on their face do not appear, except for the age of one property, to be unacceptable for purposes of determining the capitalization rate. Though some of defendant’s sales involved buildings far larger than the subject property, the rate of return did not substantially vary from other sales of defendant of smaller office buildings that would be more directly comparable to the subject property. The court accepts 9 percent as the capitalization rate. Both parties agreed that the rate should be increased by the relevant ad valorem tax millage rate of 2.757 percent so that the effective capitalization rate as of January 1, 1977, would be, and is accepted by the court as being, 11.757 percent.
 

 In summary, based on the income approach, the medical office building, exclusive of land value, had a market value as of January 1, 1977, of $2,513,264.00, computed as follows:
 

 Gross Rent $ 519,906.50
 

 Less Vacancy Deduction of 5% 25,995,33
 

 Effective Gross Rent 493.911.17
 

 Less Expenses 195,840.00
 

 Net Operating Income 298.071.17
 

 
 *[355]
 
 Capitalization $298,071 -r-11.757% = $2,535,264.00 Less Land Value 22,000.00
 

 Total Value of Medical Office Building $2,513,264.00
 

 The court thus finds the estimates of value pursuant to each of the approaches as follows:
 

 Cost approach $3,326,400
 

 Market Data Approach $2,275,000 to $2,425,000
 

 Income Approach $2,513,264
 

 It is now the duty of the court to determine a single figure as the true cash value of the subject property. Defendant argues that the cost figure alone reflects such value while plaintiff contends that the income figure alone is the proper measure.
 

 In support of its cost approach contention, defendant, in essence, argues as follows: The basic reason for the construction of the medical office building was to attract physicians to practice in juxtaposition to the hospital. These physicians, because of their office location, would, defendant asserts, cause their patients requiring hospitalization to use the services of the adjoining hospital with the result that a higher level of hospital bed occupancy would occur than otherwise would be obtainable. Thus, these physicians, by reason of their medical building occupancy, would make a contribution to the financial well-being of the hospital. As a quid pro quo for this contribution, defendant alleges that the physicians in effect received a subsidized rent from the medical center owner. The defendant further argued that no measure could be made of the value contribution to the hospital which resulted from the physicians’ occupancy of the office building. Defendant then rejected the income approach because, in its view, the net income derived from rents was not the sole measure of the value of the
 
 *[356]
 
 office building and its added value as an income contributor to the hospital was not subject to measurement. Defendant further added that a rent of $11.15 per square foot per annum would be the charge necessary to justify its version of replacement cost of the building and concluded that, in its own words "* * * to say that the net income derived solely from rents * * * in this office building is the sole measure of value says that there are a lot of stupid people building buildings to lose money; not just one, but many of them. * * *”
 

 The court does not accept defendant’s position. In effect, the defendant is claiming that if the rent were the only benefit derived from the office building, the owner of the medical center would not have invested the building construction cost it in fact made; therefore, the owner contemplated the additional contribu-tive benefits to the hospital by the office building as justifying the construction costs and, according to defendant, such unknown benefits must be ascertained before the true income occasioned by the building can be measured. This true income being unknowable, the cost approach should be used.
 

 The fundamental fallacy of defendant’s view is that the defendant is employing the value of the building
 
 to the owner
 
 of both the building and hospital, reflected in the construction cost, as the measure of the building’s market value, not the value of the building to a willing, able and reasonably well-informed buyer in the marketplace as Oregon law requires. ORS 308.205 and OAR 150-308.205-(A),
 
 supra.
 
 There is not a scintilla of evidence in the record that the willing buyer posited by Oregon law would pay the building construction cost for the alleged reason that the building contributes to the financial success of the hospital since the buyer, by hypothesis, would neither be purchasing the hospital nor would he have any financial interest in it. The contention that value to the owner is the measure of market value is
 
 *[357]
 
 not only incongruous with the basic principle of substitution elaborated earlier in this opinion but is also rejected specifically by the Oregon Supreme Court in
 
 Sabin v. Dept. of Rev.,
 
 270 Or 422, 430-431, 528 P2d 69, 73 (1974). In that case, a purchaser of land was assessed not only for its value but also for a restaurant improvement on it, although he admittedly purchased the land solely for future development. The assessor valued the restaurant at its replacement cost of $24,800. In striking the restaurant assessment, the court stated:
 

 "* * * The assessor expressed the opinion that the improvements [restaurant] would have some value to plaintiffs until the property was sold. But there was no evidence that the presence of the improvements on the property would prompt a purchaser to pay a premium over the value of the land without improvements. The figure of $24,800 represents the replacement cost of the improvements, * * * on the assumption that this measured the value to plaintiffs during the expected holding period. * * *
 
 The value to plaintiffs is irrelevant to the question of the market value which is to be determined by reference to the factors which govern the amount a willing buyer would pay on the assessment date.
 
 It being admitted that the improvements would have no effect on that amount, their assessment can not stand.” (Emphasis supplied.)
 

 Here, as in
 
 Sabin, supra,
 
 there is no evidence that the proximity of the hospital would affect the amount a willing buyer would pay for the medical office building; and, as
 
 Sabin
 
 instructs, the fact that the owner of the medical center, which includes both the building and the hospital, might have believed the value of the office building to it was worth the construction cost is irrelevant in fixing the market value mandated by law; namely, the amount a willing buyer would pay to a willing seller on the assessment date.
 

 The court also notes that since the defendant admitted that any value contribution of the office building to the hospital was not known, defendant
 
 *[358]
 
 never as a fact established that such a value contribution existed. The court, of course, cannot adopt an unproved assumption as evidence. Plaintiff testified, as an explanation for the divergence between the cost of construction and the income approach, that the financial planning for the building occurred prior to 1974 and that the actual cost of the building was higher than the planned and projected cost.
 

 The court holds that the income approach to value is appropriate to this case. Since economic data from comparable medical office buildings abound in the record, the income approach may be used although historical data of income and expense is not available from the subject property as of January 1, 1977, because of the newness of its construction. To this effect,
 
 see Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 78, 79. The evidence in the record clearly and convincingly refutes any assumption, never founded by defendant on any evidence, that the rent of plaintiffs tenants was subsidized and thus below market. To the contrary, the rent of $9.50 per square foot per annum was acknowledged by both appraisers to reflect the rent paid in strikingly comparable medical office buildings in the Portland metropolitan area as of the assessment date. The cost invested by plaintiff cannot relate to the investor in the marketplace whose concern would be the rate of return on this investment in relation to other like investments, not the value or cost of the building to the owner. The very example by which defendant seeks to demonstrate the unreliability of the income approach, by showing that a rent of $11.15 a square foot per annum would be needed to justify the cost of construction, in fact demonstrates the unreliability of the cost approach as a measure of marketplace value since $9.50 per square foot per annum was the highest rent charged or paid in comparable buildings in the Portland area in the relevant time frame. The medical office building cannot have a market value to a willing buyer in excess of the amount upon which it is capable of producing a return
 
 *[359]
 
 consistent with that returned from investments with a similar risk. It therefore follows that a willing buyer would not pay a price for a building based upon an unobtainable rental rate in excess of $9.50 per square foot. Thus, the cost approach must be relegated to its recognized role of supplying an upward limit to the market value.
 
 Medical Building Land Co. v. Dept. of Rev., supra,
 
 at 80.
 

 The market data approach, admittedly deficient in the information it yielded, must be limited to whatever corroborative value it might have of the other approaches. Any suggestion by defendant that the building is so integrated with the hospital that it should be regarded as one of special use (and thus subject to special valuation techniques) is not validated by the record. The physical walkway connection to the hospital is of a like kind to the walkway of the Good Samaritan Office Building which was the subject of
 
 Medical Building Land Co. v. Dept. of Rev., supra,
 
 and accommodation in the use of a common heating and air conditioning plant between an office building buyer and the hospital owner would reasonably be obtainable by mutual agreement, as plaintiff’s appraiser testified (without contradiction or rebuttal evidence).
 

 Plaintiff incorporated a second count in its complaint in which it protested an increase in valuation of the subject property by the assessor as of January 1, 1977, by more than $400 and by more than 5 percent without notice to plaintiff. At the trial, the vice-president for finance of plaintiff testified that notice did not come to the attention of any administrative officer. On cross-examination, the vice-president for finance testified that title to the land on which the medical center was constructed did not repose in the plaintiff but rather that the land was subject to a contract of sale with certain individuals who were the titleholders. No evidence was submitted by plaintiff stipulating the person to whom the property was
 
 *[360]
 
 assessed at the last-known address appearing in the tax records.
 

 The court finds the position of the plaintiff without merit. ORS 308.280(5) stipulates that notices of increase shall be mailed to the person to whom the property is assessed at the last-known address appearing in the tax records or at any new address reported in writing to the assessor prior to the mailing of the notice. The plaintiff, having offered no evidence that it was the person to whom the land or building was assessed at the last-known address appearing in the tax records or at any new address reported in writing to the assessor prior to the mailing of the notice, failed to establish that it, in fact, was entitled to receive notification. In view of the added fact that plaintiff did not hold title to the property, the court does not find that its failure to receive notice violated ORS 308.280.
 

 The true cash value of the subject medical office building, exclusive of the land on which it is situated, was in the amount of $2,513,264 as of January 1,1977.
 

 Defendant’s Order No. VL 78-732 shall be set aside and held for naught and the Director of the Department of Assessment and Taxation, Multnomah County, shall amend the assessment and tax rolls in conformity with this opinion. If taxes have been paid by the plaintiff in excess of those required by the tax roll as amended, the excess, with statutory interest thereon, shall be refunded to the plaintiff by the Board of County Commissioners of Multnomah County, Oregon, pursuant to ORS 311.806 and 311.812.
 

 Plaintiff is entitled to its statutory costs and disbursements.
 

 [1]
 

 In an amended Order No. VL 78-732(A), defendant excluded the value of the land on the basis that it had no jurisdiction to consider land value, in this instance. The value of the land remained at $22,000 as determined by the Multnomah County Assessor. Although defendant’s Order No. VL 78-732 involved the valuation of both building and land and no reference was made to the pleadings to the amended order, nevertheless both plaintiff and defendant agreed at trial that the value of the land was not in issue. Accordingly, the land value is not considered in this appeal but remains at $22,000.
 
 See Nepom v. Dept. of Revenue,
 
 272 Or 249, 536 P2d 496 (1975).
 

 [2]
 

 ORS 308.205 provides:
 

 "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property. * * *”
 

 OAR 150-308.205-(A)(l)(a) and 150-308.205-(A)(2) provide:
 

 "Market Value as a basis for true cash value shall be token to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed.”
 

 "Methods and Procedures for Determining True Cash Value: Real property shall be valued through the market data approach, cost approach and income approach. Any one of the three approaches to value, or all of them, or a combination of approaches, may finally be used by the appraiser in making an estimate of market value, depending upon the circumstances.”