Argued and submitted December 4, 1990, reassigned August 14, the judgment of the
Oregon Tax Court affirmed September 19, 1991

Dale S. MacHAFFIE
and Toni L. MacHaffie,
*Appellants,*

*v.*

DEPARTMENT OF REVENUE,
*Respondent.*

(OTC 2874; SC S37025)

817 P2d 1311

Dale S. MacHaffie, Beaverton, argued the cause and filed the briefs for appellants.

Bonni C. Canary, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Dave Frohnmayer, Attorney General, Salem.

GRABER, J.

### GRABER, J.

Taxpayers appeal from the Oregon Tax Court's judgment as to the true cash value of two triplexes in Hillsboro for four tax years.[1] The tax court concluded that the true cash value of the triplexes was $95,000 for 1985-86 and 1986-87, $94,000 for 1987-88, and $100,100 for 1988-89. On *de novo* review, ORS 305.445, we affirm.

■    Taxpayers contend that the tax court's valuation is too high and that the value of the subject property was $65,000 for all four years. Taxpayers have the burden to show, by a preponderance of the evidence, that their approach to valuation best reflects true cash value. ORS 305.427; OAR 150-305.115. The determination of "true cash value" is a factual one, based on the record. *Brooks Resources Corp. v. Dept. of Revenue,* 286 Or 499, 503-04, 595 P2d 1358 (1979).

The two triplexes are in a residential planned unit development in Hillsboro that has common areas and a tennis court. The triplexes were built in 1981. Each unit in each triplex contains about 1,080 square feet, is two stories high, and has a one-car garage. The triplexes are in fair condition.

Taxpayer Dale MacHaffie testified as his own expert witness on the issue of true cash value.[2] He is a member of the Oregon State Bar and a licensed real estate salesperson, and he holds a master's degree in taxation. He was qualified to give expert testimony on valuation. Tony Rosatti, a supervisor of residential appraisals for Washington County, testified as the valuation witness for defendant Department of Revenue (the Department). He has extensive experience in valuing multiple-family residential properties in Washington County and was qualified to give expert testimony.

We examine each of the four tax years at issue. We start with 1987, because that is the only year for which both the Department and taxpayers used all three valuation approaches — market, income, and cost.

---

[1] The county must assess real property at 100 percent of its "true cash value." ORS 308.232. ORS 308.205 defines "true cash value" as the market value of the property as of the assessment date.

[2] Dale MacHaffie's wife is also a party. For ease of reference, we refer to them jointly as "taxpayers," even when referring to Dale MacHaffie as their appraiser.

Using the market approach, the Department's appraiser and taxpayers estimated market value by comparing the subject property with assertedly similar properties that had sold recently. The parties took into account differences between the subject property and the assertedly comparable properties, such as differences in location, size, and age, which could account for variations in price, and adjusted the sales price of the comparable properties.

Both the Department and taxpayers relied primarily on the market (or comparable sales) approach. The Department analyzed five sales of triplexes in Washington County, including four sales that had occurred outside Hillsboro. The Department extended its search to areas outside Hillsboro, because only one triplex had sold there. Although duplexes had sold in the area, the Department concluded that triplexes in other locations would be more comparable. The average indicated value was $95,000. The Department set the value at $94,000.

■    Taxpayers contend that the triplexes used in the Department's analysis were not comparable, because only one of them was in Hillsboro. That distinguishing fact does not defeat comparability. Although only one property was in Hillsboro, absolute identity of community is not necessary for comparability. The other triplexes were located nearby, and the Department made adjustments for location. We find that the five properties were comparable.

■    Taxpayers also argue that the Department made erroneous adjustments for location. The Department based its location adjustments on Washington County reappraisal studies. As a check on its adjustments, the Department also compared the sales of duplexes in the immediate area of the subject property, which indicated a value of $97,500 — more than the value indicated using the comparable triplexes with the location adjustments. Taxpayers have failed to demonstrate that the Department's location adjustments were unreasonable.

■    Taxpayers next challenge the Department's size adjustments on comparable one-story properties that were smaller than the subject properties. They claim that the

Department's appraisal did not reflect that one-story properties cost more per square foot to construct than two-story properties. According to taxpayers, the Department should have reduced the value of the subject property when comparing it to single-story property, even though the subject property was larger than the comparable property. Taxpayers offered no evidence to support their proposition that higher construction costs are reflected in the prices for smaller one-story properties and, thus, have not shown that the Department's size adjustments were unreasonable.

■ Like the Department, taxpayers gave the most weight to the market approach. Taxpayers analyzed the sales of three duplexes, rather than triplexes, in the same subdivision as the subject property. Two of those sales were by bargain and sale deed, rather than by warranty deed. A bargain and sale deed conveys "the entire interest in the described property at the date of the deed which the deed purports to convey," but it does "not operate to provide any covenants of title." ORS 93.860(2)(a) and (3). In its analysis, the Department rejected the two comparable properties that were conveyed by bargain and sale deed, reasoning that the sales price would be less than by warranty deed. Taxpayers have not shown the Department's reasoning in that regard to be flawed. We agree with the Department that, without some upward adjustment in price (which taxpayers did not make), the sales by bargain and sale deed were not comparable.

On the one comparable sale by warranty deed, taxpayers made erroneous adjustments. First, they erroneously adjusted the value of the comparable property downward, even though it was older than the subject property. Second, they added only $2,100 to the value of the comparable property, even though each subject triplex is 1,344 square feet larger. Third, taxpayers decreased the value of the comparable property by one percent per month to adjust for the time from sale, July 1986, to the assessment date of January 1, 1987. They offered no evidence to support such a dramatic decrease in market value over that period.

The Department and taxpayers also used the income capitalization approach to determine value. Using that approach, each party first determined income and expenses to find an income stream, or net operating income. Then the

parties converted the income stream into present value by capitalization, dividing net operating income by a rate representing a return on investment.

The Department and taxpayers had similar values for net operating income. They selected different capitalization rates, however, resulting in the difference in their indicated values.

The Department selected a 9 percent capitalization rate, based on a Washington County study of apartment sales in 1986 and 1987, which showed a range of capitalization rates from 7.3 to 9.1 percent for complexes of 5 to 14 units. The selection of 9 percent, at the top of the range, was more favorable to taxpayers than a percentage at the bottom of the range, because a higher capitalization rate indicates a lower value. The Department determined that the value for 1987, using that approach, was $100,700.

Taxpayers used a capitalization rate of 12 percent for 1987. They based their rate on their experience of what a reasonable investor would expect as a return on investment. Weighing the Department's studies against taxpayers' experience, we find the Department's capitalization rate more reasonable.

Finally, the Department and taxpayers used the cost approach to determine value for 1987. As explained by the Department's appraiser, the cost approach is based on the premise that "an informed purchaser would pay no more for a property than the cost of replacing it." Using this approach, each party added the estimated value of the land to the present worth of the improvements. The present worth of the improvements is replacement cost new, minus accrued depreciation.

The Department and taxpayers used similar values for the replacement cost new. They differed in their estimates of land value and accrued depreciation, however, resulting in significant disparities in value. By this method, taxpayers estimated that the properties were worth $65,120, and the Department estimated that they were worth $103,800.

Taxpayers assert that the land value for the triplex lot was $12,000. The Department concluded that the value of

the land was $14,000. Taxpayers based their opinion of lot value on one listing of a triplex lot in Cornelius. That lot has a railroad track running along one side. It is not comparable to taxpayers' lots, which are located on a cul-de-sac with common grounds and tennis facilities, and taxpayers made no adjustments to value. Moreover, taxpayers had earlier told the board of equalization that they believed that similar lots were selling for $18,000. They changed their opinion solely on the basis of the one listing, which we find is not comparable. Taxpayers have not shown that the Department determined the wrong land value or that taxpayers' land value was more accurate.

The Department did not subtract anything for economic obsolescence. Taxpayers subtracted 15 percent for alleged economic obsolescence, because they concluded that "the economy in the area" was poor. They introduced no supporting data for that conclusion, however. Taxpayers have not provided sufficient support for their subtraction for economic obsolescence.

■        Taxpayers also subtracted 11 percent for functional obsolescence, while the Department did not subtract anything. Taxpayers subtracted for allegedly insufficient parking. Each unit in each triplex has a single-car garage and room in the driveway for one car. The Department's appraiser testified that newer subdivisions have similar parking and that it is adequate. Taxpayers produced no evidence that the allegedly insufficient parking affected market value or did not meet current standards for triplexes in the area. We find no functional obsolescence.

Taxpayers subtracted 2.5 percent per year for physical depreciation. They assumed that the six-year-old triplexes had a 40-year useful life, although they offered no evidence to support that assumption, and determined the rate accordingly.[3] The Department allowed for depreciation of 1.2 percent per year. The Department's appraiser testified that he derived his depreciation rate from a Washington County study. He explained that, close to the time of the assessment,

_____

[3] Taxpayers' appraisal report used a depreciation factor of 2.5 percent per year (40-year useful life). Their brief in this court asserts that a 4 percent per year depreciation factor (25-year useful life) is supported by the evidence. After examining the record, we disagree.

the county did a reappraisal to determine depreciation rates for each neighborhood. The study in Hillsboro indicated a depreciation rate of 1.2 percent per year. Taxpayers did not show that the study was erroneous or that the triplexes had depreciated more rapidly than other property in Hillsboro that was covered in the study.

Even if we assume that taxpayers' 2.5 percent depreciation rate is correct, the indicated value for 1987 under the cost approach is higher than the $94,000 set by the Department's market approach. That is so, because we have rejected taxpayers' deductions for economic and functional obsolescence and accepted the Department's land value. If we apply a 2.5 percent depreciation rate to the Department's improvement and land values, the indicated value for 1987 under the cost approach would be $96,879. If we apply a 2.5 percent depreciation rate to taxpayers' own improvement value but use the Department's land value, the indicated value for 1987 under the cost approach would be $94,585.

Taxpayers have failed to prove that their appraisal more accurately reflected true cash value for 1987 than did the Department's. Because taxpayers did not carry their burden of proof, we hold that the true cash value for 1987 is $94,000.

With respect to 1988, the Department again relied on the market approach. The Department's appraiser analyzed the December 18, 1989, sale of one of the subject properties. It sold for $108,700.[4] The appraiser adjusted that sale to take into account increases in property values since the assessment date. He reduced the sales price by a ratio derived from a study that tracked the percentage increase in property values in Washington County over several years, including the years in question. He also reduced the sales price by $1,000 for deferred maintenance that had been done after the assessment date. He determined that the true cash value of the subject properties as of January 1, 1988, was $100,100.

Taxpayers contend that we should disregard that sale, because it occurred after the assessment date and "contain[ed] elements of value that were unknown on the applicable assessment date." A subsequent sale of the subject

---

[4] The Department's appraiser also considered a July 1989 bid on that property of $105,000.

property can be persuasive evidence of market value, if it was an arm's-length transaction between a knowledgeable buyer and seller. The weight that we accord to a sale after the assessment date depends, among other things, on the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment.

Here, taxpayers argue that the conditions affecting value were dissimilar, because the sale occurred after water damage to the property and after foreclosure. The seller had repaired the water damage by the date of the sale, however, returning the property to its condition on the assessment date. We find that the water damage did not affect the sales price. Although foreclosure could affect sales price, taxpayers presented no evidence that it did in this case.

The Department also checked the value derived from the market approach against the value derived from the cost approach. The cost approach for 1988 yielded a value of $104,800. The Department assessed the property at the lower, market-approach value of $100,100.

Taxpayers relied on the same appraisal as in 1987. They have not proved that their appraisal more accurately reflected true cash value in 1988. Accordingly, we hold that the true cash value for 1988 is $100,100.

The tax court questioned both the Department's and taxpayers' conclusions as to value for 1985-86 and 1986-87. The court concluded, in view of the Department's opinion of $94,000 for 1987 and $100,100 for 1988, that values of $105,500 for 1985-86 and $105,100 for 1986-87 were too high. The Department earlier had assessed the value of the property at $95,000 for all four years. The court determined that that was the most likely value for 1985 and 1986.

■ Taxpayers contend that the tax court lacked authority to determine a true cash value that is different than either the Department's or taxpayers'. They are wrong; ORS 305.435 provides in part:

"Where the determination of true cash value or the correct valuation of any property subject to special assessment is an issue before the court, the court has jurisdiction to determine

such value on the basis of the evidence before it without regard to the values pled by the parties."

■ Like the tax court, we are not persuaded by the parties' valuations for 1985 and 1986. The Department's appraiser found only one comparable sale in 1985 and one in 1986. He thus relied on the cost approach. We are not persuaded in this case that the cost approach reflects all relevant market conditions. Taxpayers' appraisal was unsatisfactory, because it was not supported by sufficient market evidence.

The average indicated value for the subject property, based on the Department's comparable sales in 1987, was $95,000. The record shows that the real estate market in Hillsboro was relatively flat in the mid-1980s and that values began to increase between 1987 and 1988. Also, the Department's original appraisal report assessed the true cash value of the property as $95,000 for all four years. We find that $95,000 is the true cash value for 1985 and 1986.

We need not address taxpayers' claim for attorney fees, appraisal fees, and costs, because they have not prevailed.

The judgment of the Oregon Tax Court is affirmed.